616 F.2d 680
 Sharon L. ROGIN and Michael R. Rogin, Ann Mangano and Wm.
Mangano, Janet Caselli and Christopher Caselli, Barbara
Ueberroth and A. James Ueberroth, and Maureen Blasic and
Joseph Blasic, Individually and on behalf of others similarly situated
v.
BENSALEM TOWNSHIP and Stephen J. Kelly, Theodore R. Zajac,
William McFadden, Herbert Braden and Donald Bell,
Individually and in their official capacities as the Board
of Supervisors of Bensalem Township and Stanley Horowitz,
Individually and in his capacity as Zoning Officer of
Bensalem Township and Mark-Garner Associates, Inc., of Pennsylvania
Mark-Garner Associates, Inc., of Pennsylvania, Appellant.
 No. 79-1361.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 9, 1979.
Decided Feb. 21, 1980.
 
 Thomas P. Preston (argued), Marc D. Brookman, Duane, Morris & Heckscher, Philadelphia, Pa., for appellant.
 Leslie G. Dias (argued), Henry F. Huhn, Cornwells Heights, Pa., for appellees Bensalem Township, Kelly, Zajac, McFadden, Braden, Bell and Horowitz.
 Emil F. Toften (argued), John W. Potkai, Emil F. Toften & Associates, Chalfont, Pa., for appellee Bensalem Township Zoning Hearing Bd.
 Before ADAMS, ROSENN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 A real estate developer has cast an array of federal constitutional and statutory challenges to the application of a local zoning ordinance to a condominium project it was in the process of constructing. On this appeal from the dismissal on the pleadings of the developer's cross-claims, we are guided by well-settled principles in affirming the judgment of the district court.
 
 I. FACTUAL BACKGROUND
 
 2
 In late 1972, Mark-Garner Associates, Inc., a real estate developer and the cross-claimant in this case, purchased approximately fifty acres of land in Bensalem Township, Bucks County, Pennsylvania, and drew up plans to build a 557-unit condominium project to be known as "Bensalem Village." On May 16, 1973, the Board of Supervisors of Bensalem Township granted final approval of the plans. In accordance with Pennsylvania law, Mark-Garner then filed a "Condominium Declaration" and a statement of "Rules and Regulations for Bensalem Village."[1] In reliance on the Supervisors' final approval of the Bensalem Village plans, construction of the Village community commenced in the spring of 1973, and continued until September 1976. By the latter date, 106 of the planned 557 condominium units had been approved and were under construction, and a major portion of the common area improvements had been completed.[2]
 
 
 3
 On September 24, 1976, Mark-Garner applied for twelve additional building permits. For the first time, its request was denied.[3] The Township Zoning Officer, Stanley Horowitz, informed the developer that the plan for Bensalem Village no longer complied with the township's zoning ordinance, which had been amended in June 1973, a little over a month after the Supervisors approved the original plan. The amendment reduced the allowable density in the R-4 District, the classification applicable to Bensalem Village, from twelve to ten units per acre. Mark-Garner appealed the zoning officer's decision to the Zoning Hearing Board of Bensalem Township. On October 8, 1976, prior to the date of the hearing on the appeal, the Board of Supervisors again amended the ordinance to lower the permissible density in the R-4 District to four units per acre. As a result of the two amendments, the total number of units that lawfully could be built in Bensalem Village was reduced from 557 to 200.
 
 
 4
 After several hearings, the Zoning Hearing Board denied Mark-Garner's appeal. The developer appealed the Board's decision to the Court of Common Pleas of Bucks County, and also requested mandamus directing the Zoning Officer to issue the remaining permits. The Court reversed the Zoning Hearing Board's decision and ordered that all remaining permits be issued.[4] Because the project was "substantially undertaken," the Court concluded, Pennsylvania law prohibited the retroactive application of the zoning amendments to Bensalem Village.[5] The Court's mandate was stayed pending the appeal by the Zoning Hearing Board to the Commonwealth Court, which has not yet rendered its decision. As a consequence, the Zoning Officer has issued no permits to Mark-Garner since September 1976.
 
 
 5
 The present class action was filed during the pendency of Mark-Garner's appeal to the Court of Common Pleas by a group of homeowners who had purchased lots in Bensalem Village. The complaint requested injunctive relief directing the Zoning Officer to issue the remaining permits as well as money damages resulting from the delay in construction. Mark-Garner, which was named as a defendant, cross-claimed for damages, declaratory judgment, and injunctive relief against the Township, the members of the Board of Supervisors, the Zoning Hearing Board, and the Zoning Officer. The individual cross-defendants were named in both their official and personal capacities. Mark-Garner alleged that the cross-defendants, acting under color of state law, conspired to adopt and implement a policy of delay and cost escalation for the purpose of discouraging construction of Bensalem Village. The developer claimed that the value of its property was thereby diminished or destroyed, and that it was denied substantive due process, procedural due process, equal protection of the laws, and its rights under state and local statutes. Federal subject matter jurisdiction was premised both on civil rights statutes, 42 U.S.C. §§ 1983, 1985(3) and 1986 (1976), and on a purported direct cause of action under the Fourteenth Amendment.[6]
 
 
 6
 Following a motion by the cross-defendants, the district court dismissed Mark-Garner's cross-claim for failure to state a claim on which relief could be granted,[7] and because the Court of Common Pleas' decision rendered the case moot.[8] Mark-Garner filed a timely appeal. We hold that the case is not moot, but affirm the district court's decision that the cross-claim does not state a cause of action.
 
 II. MOOTNESS
 
 7
 It was suggested by the district court that Mark-Garner's claims were moot because it had received injunctive relief in the Court of Common Pleas. Inasmuch as mootness would divest us of jurisdiction to consider this appeal,[9] we are obligated to address this issue as a threshold matter.
 
 
 8
 The present dispute is unlike the traditional line of mootness cases in which changes extraneous to the judicial process terminate the legal controversy.[10] The district court apparently has held that Mark-Garner's federal civil rights claims are moot because similar claims based on state law were adjudicated in favor of the developer in a state tribunal. Such a ruling, we believe, incorrectly interprets the law of mootness.[11]
 
 
 9
 "(A) case is moot," the Supreme Court has held, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."[12] The Court has developed a two-pronged test for mootness. A case may become moot if (1) "it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."[13]
 
 
 10
 In the occurrent case, neither prong is satisfied. The Court of Common Pleas' judgment determined only Mark-Garner's state law claim for injunctive relief; it was not presented, however, with any federal civil rights claims or with any claim for damages. Thus, the state court's relief cannot be said to have "completely eradicated" the effects of the alleged violation. Nor can it be said that there has been an "irrevocable eradication" even of the state law violations, for the Court of Common Pleas' decision has been appealed, and thus could be reversed by a higher Pennsylvania court. Finally, inasmuch as the Court of Common Pleas decided only questions of state law, there is no assurance that the federal constitutional violations alleged in the cross-claim will not recur. In short, there are present here "live" federal constitutional issues that have not been adjudicated in any other court. And in view of the large amount of unsettled damages, both parties have a legal interest in the outcome. Accordingly, we hold that the case is not moot and proceed to the substantive questions pressed by Mark-Garner regarding the dismissal of the cross-claim.
 
 III. SUBSTANTIVE CLAIMS
 
 11
 In reviewing the dismissal on the pleadings for failure to state a claim, we must take all of the well-pleaded allegations of the cross-claim as true, construe the cross-claim in the light most favorable to Mark-Garner, and determine whether, under any reasonable reading of the pleadings, the developer might be entitled to relief.[14]
 
 
 12
 A. Direct Claims for Damages under the Fourteenth Amendment
 
 
 13
 Mark-Garner brought several of its claims directly under the Fourteenth Amendment. These claims alleging abridgements of due process and equal protection are premised on the assumption that there exists an implied cause of action for damages under the Fourteenth Amendment that is wholly independent of statutory authorization. The Supreme Court has not yet decided whether such a cause of action exists.[15] It has held, however, that there is an implied cause of action for damages under the Fourth[16] and Fifth[17] Amendments. We have declared that such an action exists for suits brought under the First Amendment,[18] but have reserved the question whether such a cause of action exists under the Fourteenth Amendment.[19] Other courts of appeals have held explicitly that there is an implied cause of action for damages under a number of constitutional provisions.[20]
 
 
 14
 There is no occasion to decide, in the present case, whether the Fourteenth Amendment authorizes a direct cause of action for damages,[21] however, because Mark-Garner has alleged causes of action under § 1983 that are premised on its constitutional claims. Indeed, § 1983 was designed to afford plaintiffs a cause of action for constitutional violations on the part of local governmental bodies and other state officials.[22]
 
 
 15
 In Mahone v. Waddle, 564 F.2d 1018 (3d Cir. 1977), cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978), two black citizens brought suit against the City of Pittsburgh as well as two of its police officers, alleging that the officers abused them on account of their race. The plaintiffs sought damages under 42 U.S.C. §§ 1981, 1983, and 1985 and under the Fourteenth Amendment. The district court dismissed the claims against the city on the basis of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), in which the Supreme Court had held that municipalities were immune from suit under § 1983.[23] We affirmed the dismissal of the claims based on the Fourteenth Amendment and §§ 1983 and 1985, but reversed the dismissal of the claim based on § 1981. "In view of our holding in this case that plaintiffs have stated a cause of action against the city under 42 U.S.C. § 1981," we concluded, "a fourteenth amendment remedy should not be implied. . . . If plaintiffs prove the racially motivated deprivations of their rights which they allege, section 1981 will afford them the redress in federal court which they seek. Bivens teaches that the existence of an effective and substantial federal statutory remedy for the plaintiffs obviates the need to imply a constitutional remedy on (their) behalf."[24]
 
 
 16
 The principle enunciated in Mahone applies to the present action. Section 1983 affords Mark-Garner remedies at law or equity against the named defendants for any constitutional violations that can be established.[25] It is now settled that cities and other municipal bodies, such as the Bensalem Zoning Hearing Board, are "persons" within the meaning of § 1983.[26] Therefore, it would be a redundant and wasteful use of judicial resources to permit the adjudication of both direct constitutional and § 1983 claims where the latter wholly subsume the former.[27]
 
 B. Section 1983 Claims
 
 17
 The developer alleges that the defendants deprived it of four constitutional rights for which § 1983 authorizes remedial causes of action.[28] Specifically, it claims a denial of equal protection, a deprivation of substantive due process, that its property was taken without just compensation, and that it was deprived of procedural due process. Inasmuch as a reading of well-settled case law convinces us that Mark-Garner could not prevail on any of its § 1983 allegations, we hold that the district court did not err in dismissing them.
 
 1. Equal Protection
 
 18
 Mark-Garner charges that the cross-defendants denied it the equal protection of the laws because they passed zoning amendments for the purpose of discriminating against developers that had previously obtained construction approval for plans of greater density than that authorized by the amendments. Essentially, the charge is that the amendments unconstitutionally classified developers into two groups those that had obtained construction approval at the time of the passage of the amendments and those that had not.
 
 
 19
 The allegations in the cross-claim suggests no basis for applying any equal protection standard except the rational relationship test.[29] In applying this test to legislation that affects business or other economic activity, the Supreme Court has accorded great deference to the legislative decision to establish the challenged classification. The Court's most recent statement of the rule was in Vance v. Bradley, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), a case involving a challenge to a federal law mandating that participants in the Foreign Service Retirement System retire at ate sixty. The Court held that "we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational."[30]
 
 
 20
 Such broad deference is extended to legislative judgments dealing with business and economic matters because of the recognition that the process of democratic political decisionmaking often entails the accommodation of competing interests, and thus necessarily produces laws that burden some groups and not others. In the absence of special justification for more searching judicial examination such as an allegation that the legislative body has classified on the basis of a suspect characteristic for a court to undo the fruits of this process would be "to condemn as unconstitutional the most characteristic product of a democratic (perhaps of any) political system."[31]
 
 
 21
 To prevail on its equal protection claim, Mark-Garner must persuade us that the passage and application to it of the zoning amendments "so lack rationality that they constitute a constitutionally impermissible denial of equal protection."[32] Construing its cross-claim in the light most favorable to the developer, we conclude that it cannot discharge this burden.
 
 
 22
 Although zoning laws "must find their justification in some aspect of the police power, asserted for the public welfare," it is well-settled that such measures are constitutional if they bear a "substantial relation to the public health, safety, morals, or general welfare." Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 387, 395, 47 S.Ct. 114, 118, 121, 71 L.Ed. 303 (1926). The concept of general welfare has been broadly construed: "The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 102-03, 99 L.Ed. 27 (1954).
 
 
 23
 Relying on these decisions, the Supreme Court, in Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), upheld a zoning law that defined the term "family" so as to exclude the plaintiffs a group of six unrelated college students who had rented a house in the Village. Identifying the legitimate governmental purpose, the Court observed:
 
 
 24
 A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one within Berman v. Parker (348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954)). The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people.[33]
 
 
 25
 Under these standards of rationality and legitimacy Mark-Garner cannot succeed with its equal protection claim. The Supervisors legitimately could have concluded that it was in the best environmental and economic interests of Bensalem Township to limit the number of residents and to prevent overcrowding. Reduction of the allowable density level of the R-4 zoning previously obtained district is a rational and reasonable means to accomplish this goal.[34] That the zoning amendments burden developers who had previously obtained construction approval more than they burden developers that may, in the future, plan to build in an R-4 zone, does not, under an equal protection analysis, vitiate either the reasonableness or the legitimacy of the density restrictions. In passing the amendments, the Supervisors reasonably could have concluded that it was necessary to limit growth immediately because the completion of Bensalem Village, as originally approved, would so add to both the population and density that the purposes of the amendments would be frustrated. Inasmuch as we must defer to that judgment unless we find it to be so unrelated to the achievement of the Township's objectives as to be irrational[35] and we do not we hold that the district court did not err in concluding that Mark-Garner did not state an equal protection claim under § 1983.
 
 2. Substantive Due Process
 
 26
 Zoning laws are most commonly challenged on the ground that they violate substantive due process. At one time, the Supreme Court was willing to question the fairness and wisdom of a particular state statute and, despite disclaimers to the contrary,[36] to substitute its judgment about social policy for that of the legislative body. If the statute, in the Court's opinion, did not further the public interest in safety, morals, or welfare, the law was held to exceed the authority of the legislature and therefore to abridge the liberty and property protections of the due process clause.[37] In more recent years, the Court has abjured this supervisory role, however, and now applies virtually the same standard of review under the due process clause as it does in equal protection cases involving economic classifications.[38] The test for determining whether a law comports with substantive due process is whether the law is rationally related to a legitimate state interest. "(T)he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."[39] Unlike equal protection, however, the focus of due process analysis is not whether the Township has irrationally distinguished between similarly situated classes, but whether it was irrational for the Township to have passed the law at all and to have applied it to Mark-Garner.[40]
 
 
 27
 As we observed in deciding whether Mark-Garner stated an equal protection cause of action,[41] the Township has a legitimate interest in controlling population growth and density and the zoning amendments are a rational and reasonable means to accomplish that purpose. Therefore, the zoning amendments were not arbitrary or irrational and the district court did not err in dismissing the § 1983 substantive due process claim.[42]
 
 3. Taking Without Just Compensation
 
 28
 Although a zoning ordinance or other law comports with the requirements of substantive due process, it nonetheless may violate the "taking" clause of the Fifth Amendment that is applicable to the states through the Fourteenth Amendment.[43] Thus, if an otherwise valid law severely diminishes the value or impairs the use of a parcel of land, the state or local government may be constitutionally obligated to compensate the owner.[44] Mark-Garner predicates the third of its § 1983 claims on the ground that the defendants' actions unconstitutionally diminished the value of Bensalem Village and therefore constituted a taking of property.
 
 
 29
 In this regard, the Supreme Court recently observed: "The question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty" involving "essentially ad hoc, factual inquiries."[45] Two factors appear to be of more importance to the Court than others. First, if the law in question applies generally to a broad class of properties, the Court is likely to sustain it.[46] The Court has stated that zoning laws are the classic example of this kind of general, social welfare legislation.[47] Second, unless application of the law destroys or severely diminishes the value of the property, the Court will uphold the application. This is true even if the legislation prohibits "a beneficial use to which individual parcels had previously been devoted and thus cause(s) substantial individualized harm."[48]
 
 
 30
 Two cases aptly illustrate the Court's approach to "taking" questions. Goldblatt v. Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), dealt with a challenge to a city ordinance that banned any excavations below the water table and which had the effect of preventing the claimant from continuing a sand and gravel business he had operated for thirty years. In upholding the application of the ordinance, the Court noted that, as a safety measure, the law was a valid exercise of the police power.[49] It then concluded that, although the ordinance deprived the property of its most beneficial use, it was not unconstitutional. So long as the lot retained value, and there was no indication to the contrary, the ordinance was valid.[50] More recently, in Penn Central Transportation Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Court rejected a "taking" challenge to New York City's Landmarks Preservation Law. The City had declared Grand Central Terminal to be a landmark and invoked the statute to block construction of a high-rise office building on top of the Terminal. Application of the law was not a taking, the Court held, because the "restrictions imposed are substantially related to the promotion of the general welfare and not only permit reasonable beneficial use of the landmark site but also afford appellants opportunities further to enhance not only the Terminal site proper but also other properties."[51]
 
 
 31
 Applying the principles of these cases to the matter at hand, we conclude that the district court did not err in dismissing Mark-Garner's § 1983 "taking" claim. We have already held that the zoning amendments are valid exercises of the police power, passed as a means to limit the number of persons who might move into the area and to prevent overcrowding.[52] The amendments apply generally to all land within the R-4 zone, not only to Bensalem Village. The burden of the restrictions, although perhaps affecting Mark-Garner more than other landowners, is distributed over a substantial portion of the citizenry. Moreover, the general reduction in population density very likely will benefit the developer to some extent by making the remaining units in Bensalem Village more desirable. The first element of the "taking" calculus therefore operates in favor of validity in this case. In Penn Central, the Supreme Court remarked:
 
 
 32
 It is, of course, true that the Landmarks Law has a more severe impact on some landowners than on others, but that in itself does not mean that the law effects a "taking." Legislation designed to promote the general welfare commonly burdens some more than others . . . (Z)oning laws often affect some property owners more severely than others but have not been held to be invalid on that account. For example, the property owner in Euclid who wished to use its property for industrial purposes was affected far more severely by the ordinance than its neighbors who wished to use their land for residences.
 
 
 33
 * * * Unless we are to reject the judgment of the New York City Council that the preservation of landmarks benefits all New York citizens and all structures, both economically and by improving the quality of life in the city as a whole which we are unwilling to do we cannot conclude that the owners of the Terminal have in no sense been benefited by the Landmarks Law. Doubtless appellants believe they are more burdened than benefited by the law, but that must have been true, too, of the property owners in Miller, Hadacheck, Euclid, and Goldblatt.[53]
 
 
 34
 The second element of the "taking" formula also supports a conclusion in favor of validity. When as a result of governmental actions the diminution in the value of land reaches a "certain magnitude," the Court has held that compensation must be paid.[54] Although it has never attempted to delineate what constitutes a "certain magnitude," the Court has required compensation only in cases in which the value of the property was reduced drastically.[55] In Penn Central, for example, the Court sustained the application of the Landmarks Preservation Law despite the fact that the legislation denied the claimants income that would have been generated by a fifty-five story office building in midtown Manhattan.[56] The Court also cited approvingly cases in which the challenged law had reduced the value of the land by as much as seventy-five and eighty-seven percent.[57]
 
 
 35
 Mark-Garner asserts in its cross-claim that it purchased the land which now comprises Bensalem Village for approximately $3 million. As a result of the application of the zoning amendments, it alleges that the current market value of the property is about $2 million. In view of the Supreme Court's long-standing tolerance of much greater diminutions in value, the averments in the cross-claim do not set forth a colorable claim in this regard.[58] Since both elements of the taking equations weigh heavily in favor of the constitutionality of the amendments' application to Bensalem Village, we conclude that the district court did not err in dismissing Mark-Garner's § 1983 taking claim.[59]
 
 4. Procedural Due Process
 
 36
 Mark-Garner's final § 1983 theory is that it was denied procedural due process. The developer alleges that the cross-defendants conspired to violate its substantive constitutional rights and that the supervisors announced publicly that they would take all steps necessary to stop the construction of Bensalem Village and similar real estate developments. Mark-Garner does not allege, however, that the Township's zoning and appellate procedures are constitutionally deficient or that the cross-defendants failed to comply with those procedures.
 
 
 37
 The due process claim against the Board of Supervisors is without merit because, in passing the amendments, the Board was acting in a legislative capacity. The amendments applied to all property within the R-4 district, not merely to Bensalem Village. They constitute general statements of Township policy rather than specific applications of policy to a particular landowner, and therefore can be characterized only as legislative acts.[60] Long ago, the Supreme Court decided that the protections of procedural due process do not extend to legislative actions. In Bi-Metallic Investment Co. v. State Board of Equalization of Colorado, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915), the Court rejected a landowner's assertion that he had a due process right to a hearing before the State Board of Equalization voted on an order increasing by forty percent the valuation for tax purposes of all property in Denver. Writing for a unanimous Court, Justice Holmes observed:
 
 
 38
 Where a rule of conduct applies to more than a few people, it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule. . . . There must be a limit to individual argument in such matters if government is to go on.
 
 
 39
 Id. at 445, 36 S.Ct. at 142. See Eastlake v. Forest City Enterprises, Inc., 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976) (city charter provision requiring proposed land use changes to be ratified by fifty-five percent of electorate does not violate due process rights of landowner applying for zoning change).
 
 
 40
 To provide every person affected by legislation the various rights encompassed by procedural due process including hearings, opportunity for confrontation and response, clear standards, an impartial arbiter, and possibly judicial review would be inconsistent with the structure of our system of government. The act of legislating necessarily entails political trading, compromise, and ad hoc decisionmaking which, in the aggregate, produce policies that at least approximate a fair and equitable distribution of social resources and obligations.
 
 
 41
 Absent an indication that this process inherently treats a particular class of persons inequitably,[61] it is unnecessary for the courts to intervene because the relatively large number of persons affected works to ensure that the legislature will not act unreasonably toward the populace.[62] In short, the general theory of republican government is not due process through individual hearings and the application of standards of behavior, but through elective representation, partisan politics, and the ultimate sovereignty of the people to vote out of office those legislators who are unfaithful to the public will.[63] Inasmuch as the Supervisors, in passing the zoning amendments, were acting in a legislative capacity, Mark-Garner has no procedural due process claim against their actions.
 
 
 42
 We also conclude that Mark-Garner has failed to state a procedural due process claim in regard to the actions of the Zoning Officer and Zoning Hearing Board. Their actions were administrative in nature because they involved application of the Township's general zoning policies as manifested in the amendments to a particular parcel of land. Thus, Mark-Garner is entitled to claim the procedural protections of the due process clause in challenging the officials' refusal to grant it further building permits. The fatal flaw in the developer's claim in this respect, however, is that it fails to set forth any behavioral or structural allegations from which we can infer that Bensalem's process was unconstitutional.
 
 
 43
 Before a governmental body may deprive a landowner of a property interest, it must provide due process. The exact process required varies with the demands of the particular situation in question.[64] A balancing test has been articulated by the Supreme Court to determine the requirements of due process for any given situation: the private interest affected by the governmental action and the value of additional procedural safeguards are to be weighed against the fiscal and administrative burdens that additional procedures would impose on the government.[65] The Court has identified the following as elements of due process: (1) notice of the basis of the governmental action; (2) a neutral arbiter; (3) an opportunity to make an oral presentation; (4) a means of presenting evidence; (5) an opportunity to cross-examine witnesses or to respond to written evidence; (6) the right to be represented by counsel; and (7) a decision based on the record with a statement of reasons for the result.[66] Whether all or any one of these safeguards are required in a particular situation depends on the outcome of the balancing test mentioned above.[67]
 
 
 44
 In order to resolve this appeal, it is not necessary to decide which procedural protections are mandated by due process in the present context. Rather, we hold that Mark-Garner's cross-claim, beyond making a general assertion of denial of due process, fails to allege that Bensalem's permit and appellate procedures were constitutionally deficient in any way.
 
 
 45
 The Pennsylvania legislature has enacted a system for processing challenges to zoning ordinances. The Zoning Officer, the primary administrator of the ordinance, is charged with its execution "in accordance with its literal terms, and shall not have the power to permit any construction or any use or change of use which does not conform to the zoning ordinance."[68] The inflexible ministerial nature of the Zoning Officer's role is mitigated by the zoning appeals process. A landowner who wishes to challenge the validity of a zoning ordinance or amendment that restricts the use or development of its land may file a challenge with the Zoning Hearing Board[69] and may appeal from any decision by the Zoning Officer applying the ordinance.[70] The latter course may be taken when, as here, the landowner believes that the Zoning Officer misapplied an applicable rule of law.[71]
 
 
 46
 The Zoning Hearing Board is an administrative-adjudicatory agency. Its members must be residents of the municipality, and are appointed by the Board of Supervisors for terms of three years.[72] Whenever an appeal or challenge to a zoning ordinance is brought to the Zoning Hearing Board, it is required by statute to conduct a hearing on the claim. Section 10908 of the Commonwealth's Municipal Corporations Code mandates that the Board provide the following procedures: (1) Notice must be given to the public, the Zoning Officer, and the person challenging the ordinance or action. (2) The Board or hearing officer must conduct the hearings and, unless the parties waive this right, the Board itself must make findings and render the decision on the merits. (3) The Board has the power to administer oaths, and to compel the appearance of witnesses and the production of documents requested by the parties. (4) Each party has the right to be represented by counsel. (5) Each party has the right to present evidence and argument, and to cross-examine adverse witnesses. (6) The Board is required to maintain a record of the proceedings. (7) Ex parte communication between the Board or the hearing officer and any party is prohibited. (8) The Board is required to publish its findings and conclusions within forty-five days of the last hearing.[73] If the landowner is dissatisfied with the Board's decision, it then has the right to appeal to the Court of Common Pleas.[74] The appeal may take the form of direct judicial review of the Board's decision, or the court may take new evidence and enter its own findings of fact after trial de novo.[75] The Court is authorized "to declare any ordinance or map invalid and to set aside or modify" any action, decision, or order of the Township, Zoning Officer, or Zoning Hearing Board.[76]
 
 
 47
 In Pennsylvania the procedure for challenging zoning ordinances substantially conforms with the general due process guidelines enunciated by the Supreme Court.[77] Mark-Garner acknowledges in its cross-claim that it submitted to this process that it received a hearing, a decision on the merits by the board, and obtained judicial review of that decision. Indeed, on review, the Court of Common Pleas granted the developer the relief it requested.[78] Although it asserts that it was denied procedural due process during the course of the adjudication before the Zoning Hearing Board, Mark-Garner makes no specific allegation of deficiency in this process. As a consequence, and in view of the fact that Pennsylvania's system of adjudicating zoning challenges appears to be consistent with the requirements of due process, the district court did not err in holding that Mark-Garner fails to state a colorable procedural due process claim.C. Sections 1985(3) and 1986
 
 
 48
 Mark-Garner's final federal claims arise under two provisions of the Ku Klux Klan Act of 1871, 42 U.S.C. §§ 1985(3) and 1986 (1976). The purpose of this Act was to place each newly freed black "on an equal footing before the law with his former master."[79] Section 1985(3) establishes a cause of action against any person who enters into a private conspiracy for the purpose of depriving the claimant of the equal protection of the laws.[80] Section 1986 is a companion to § 1985(3) and provides the claimant with a cause of action against any person who, knowing that a violation of § 1985 is about to be committed and possessing power to prevent its occurrence, fails to take action to frustrate its execution.[81] Because transgressions of § 1986 by definition depend on a preexisting violation of § 1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fail also.[82]
 
 
 49
 The Supreme Court's most thorough discussion of these sections was in Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). There, several black persons brought suit under § 1985(3) alleging that the defendants, a group of white Mississippians, conspired and acted to deprive the plaintiffs of their equal rights by beating and threatening to kill them. The Court rejected the defendants' argument that the statute required state action, and interpreted it as covering purely private conspiracies as well.[83] To effect Congress' intent not to embrace all tortious conspiratorial interferences with the rights of others, however, the Court held that § 1985(3) applied only to private conspiracies predicated on "racial, or perhaps otherwise class-based, insidiously discriminatory animus."[84]
 
 
 50
 We need not decide today whether § 1985(3) embraces private conspiracies to discriminate on the basis of factors other than race.[85] At most, that statute proscribes private conspiracies to engage in discrimination that, but for the lack of state action, would violate the equal protection clause. Inasmuch as we have already concluded that the defendants did not deprive Mark-Garner of equal protection, we hold that the developer has not stated a cause of action under §§ 1985(3) and 1986. Consequently, the district court did not err in dismissing these claims.
 
 D. Pendent State Claims
 
 51
 Along with the federal civil rights claims, Mark-Garner asserted several claims based on state and local law. In United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), the Supreme Court declared that federal courts have the power to entertain pendent state claims if the federal and state claims "derive from a common nucleus of operative facts" such that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding." The Court went on to observe, however, that "(c)ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."[86] In Rosado v. Wyman, 397 U.S. 397, 402-05, 90 S.Ct. 1207, 1212-1214, 25 L.Ed.2d 442 (1970), the Court modified this position somewhat in approving the district court's retention of pendent state claims after dismissing the federal claims for mootness. Because the district court had invested substantial time in the case prior to the federal claims becoming moot, the Court held that the trial judge had discretion to retain jurisdiction over the remaining state claims.[87]
 
 
 52
 Upon dismissing the federal claims in this action, the district judge declined to retain jurisdiction over the pendent state claims. In view of the fact that the dismissal of the federal claims occurred during the pleading stage of the proceedings, we find no abuse of discretion in this regard, and accordingly affirm the district court's decision.[88]
 
 IV. CONCLUSION
 
 53
 In the past century the nation has witnessed the rise and decline of federal judicial protection of rights inhering in the ownership of interests in real property. Today, the Supreme Court affords state and local governments broad latitude in enacting and implementing legislation affecting the use of land. Implicit in this deference is the recognition that land-use regulation generally affects a broad spectrum of persons and social interests, and that local political bodies are better able than federal courts to assess the benefits and burdens of such legislation. Thus, absent defects in the process of enacting the legislation, or manifest irrationality in the results flowing from that process, courts will uphold state and local land use regulations against challenges based on federal constitutional grounds.
 
 
 54
 Mark-Garner has advanced a broad series of federal statutory and constitutional challenges to the Township's retroactive application of the zoning amendments to the Bensalem Village project. The cost of delay incurred by the developer were indeed substantial. Yet this factor alone does not permit us to afford relief where neither Congress nor the Constitution provides a basis for such remedial action. Despite its sweeping attempts, Mark-Garner simply does not state claims that would, if proved, entitle it to federal statutory or constitutional relief. Therefore, we hold that the district court did not err in dismissing the federal claims. And, because the trial judge did not abuse his discretion in dismissing the remaining pendent state claims, the judgment of the district court will be affirmed.
 
 
 
 [1]
 68 Pa.Stat.Ann. § 700.401 (Purdon 1965). For a general description and appraisal of the statute, commonly known as the "Unit Property Act," see Rosenstein, Inadequacies of Current Condominium Legislation A Critical Look at the Pennsylvania Unit Property Act, 47 Temple L.Q. 655 (1974)
 
 
 [2]
 The improvements included completion of the storm sewers, sanitary sewers, water lines, and service roads, as well as eighty percent of the underground electric feed lines and telephone trunk lines
 
 
 [3]
 Despite the Supervisors' general approval of all 557 planned units, the developer apparently was required to apply periodically for the actual building permits as it became ready to build a cluster of units
 
 
 [4]
 In re Appeal by Mark-Garner Assocs., Inc., No. 77-0718-09-5 (Ct.Comm.Pl. filed May 18, 1978), reprinted in App. 225
 
 
 [5]
 Section 508(4) of the Pennsylvania Municipalities Code, 53 P.S.Pa.Stat. § 10508(4) (Purdon 1972), provides in relevant part:
 When an application for approval of a plat, whether preliminary or final, has been approved or approved subject to conditions acceptable to the applicant, no subsequent change or amendment in the zoning, subdivision or other governing ordinance or plan shall be applied to affect adversely the right of the applicant to commence and to complete any aspect of the approved development in accordance with the terms of such approval within three years from such approval. Where final approval is preceded by preliminary approval, the three-year period shall be counted from the date of the preliminary approval.
 The court held that if a development project is "substantially undertaken within the Section 508(4) three year period the protections of that Section are invoked and remain in effect until the project is completed." In re Appeal by Mark-Garner Assocs., supra note 4, at 4-7.
 
 
 [6]
 Mark-Garner alleged that the district court had jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202 (1976), and had pendent jurisdiction over the state claims
 
 
 [7]
 Fed.R.Civ.P. 12(b)(6)
 
 
 [8]
 The district court also dismissed the homeowners' claim under Rule 12(b) (6). However, the the homeowners have not appealed
 
 
 [9]
 DeFunis v. Odegaard, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974) (per curiam); North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 403, 30 L.Ed.2d 413 (1971) (per curiam)
 
 
 [10]
 E. g., County of Los Angeles v. Davis, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (case moot because county fire department had not employed the allegedly discriminatory test for ten years and had fully remedied effects of prior discriminatory use); DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (case moot because law school applicant challenging racially preferential admissions policy had been admitted and defendant school acknowledged that, regardless of Court's decision, applicant would continue to be enrolled); Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969) (per curiam) (case moot because length of challenged voter residency requirement was shortened by state legislature such that plaintiffs could have voted in last and all future elections)
 
 
 [11]
 In fact, there may not be a mootness question in this case at all. Rather, the actual effect of the Court of Common Pleas' decision might be to preclude Mark-Garner from suing in federal court, at least as to the state claims, under the doctrine of res judicata. Res judicata is an affirmative defense, Fed.R.Civ.P. 8(c), not a question of jurisdiction. Scholla v. Scholla, 92 U.S.App.D.C. 9, 201 F.2d 211, 213 (D.C. Cir.), cert. denied, 345 U.S. 966, 73 S.Ct. 951, 97 L.Ed. 1384 (1953). Because the defendants did not raise the defense in their pleadings, we do not address the issue. See First Nat'l State Bank of New Jersey v. Commonwealth Federal Sav. and Loan Ass'n of Norristown, 610 F.2d 164, 170 (3d Cir. 1979); Sartin v. Comm'r of Pub. Safety, 535 F.2d 430, 433 (8th Cir. 1976)
 
 
 [12]
 Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969), quoted in County of Los Angeles v. Davis, 440 U.S. at 631, 99 S.Ct. at 1383
 
 
 [13]
 County of Los Angeles v. Davis, 440 U.S. at 631, 99 S.Ct. at 1383
 
 
 [14]
 Helstoski v. Goldstein, 552 F.2d 564, 565 (3d Cir. 1977) (per curiam). In Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), a civil rights action, Mr. Chief Justice Burger wrote for a unanimous Court:
 When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.
 
 
 [15]
 In Mt. Healthy School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977), the Court stated: "The question of whether . . . we should by analogy to our decision in Bivens . . . imply a cause of action directly from the Fourteenth Amendment which would not be subject to the limitations contained in § 1983, is one which has never been decided by this court. We agree with respondent" that "it is an extremely important question and one which should not be decided on this record." See Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 398-400, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979); Aldinger v. Howard, 427 U.S. 1, 4 n.3, 96 S.Ct. 2413, 2415, 49 L.Ed.2d 276 (1976); City of Kenosha v. Bruno, 412 U.S. 507, 511-14, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). See also Monell v. Dept. of Soc. Servs., 436 U.S. 658, 712-13, 98 S.Ct. 2018, 2046-2047, 56 L.Ed.2d 611 (1978) (Powell, J., concurring)
 
 
 [16]
 Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)
 
 
 [17]
 Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979)
 
 
 [18]
 Paton v. LaPrade, 524 F.2d 862, 869-70 (3d Cir. 1975)
 
 
 [19]
 Gagliardi v. Flint, 564 F.2d 112, 115-16 (3d Cir. 1977), cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). Cf.: id. at 117-26 (Gibbons, J., concurring) (arguing that this Court had previously decided that direct cause of action under Fourteenth Amendment exists citing Rotolo v. Borough of Charleroi, 532 F.2d 920, 922 (3d Cir. 1976) (per curiam); McCullough v. Redevelopment Auth. of Wilkes-Barre, 522 F.2d 858, 864 (3d Cir. 1975); Alderman v. Philadelphia Hous. Auth., 496 F.2d 164 (3d Cir.), cert. denied, 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974))
 
 
 [20]
 For an exhaustive listing, see Davis v. Passman, 571 F.2d 793, 807 n.6 (5th Cir. 1978) (en banc) (Goldberg, J., dissenting), rev'd, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). See also Lehmann, Bivens and its Progeny, 4 Hastings Const.L.Q. 531, 566-68 and nn.226-29 (1977) (collecting district court decisions)
 
 
 [21]
 The opposing sides of the question whether a direct cause of action under the Fourteenth Amendment exists are set forth in Gagliardi v. Flint, 564 F.2d 112, 117-26 (3d Cir. 1977) (Gibbons, J., concurring) (there is such a cause of action) cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978), and in Mahone v. Waddle, 564 F.2d 1018, 1052-61 (3d Cir. 1977) (Garth, J., dissenting in part and concurring in part) (there is no such cause of action), cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978)
 
 
 [22]
 See Monell v. Dept. of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)
 
 
 [23]
 The Supreme Court subsequently overruled Monroe in Monell v. Dept. of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), on the ground that, in the earlier decision, it had misread the legislative history of § 1983
 
 
 [24]
 564 F.2d at 1024-25 (referring to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 407-11, 91 S.Ct. 1999, 2010-2012, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring))
 
 
 [25]
 Section 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [26]
 Monell v. Dept. of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). See note 23 supra and accompanying text
 
 
 [27]
 We express no opinion on the issue whether a direct cause of action under the Fourteenth Amendment would be available in the absence of an effective federal statutory remedy. See notes 15 and 21 supra
 
 
 [28]
 See Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972) (§ 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3), apply to property as well as personal rights). For a thoughtful criticism of this expansion of § 1983, see H. Friendly, Federal Jurisdiction: A General View 90-92 (1973)
 
 
 [29]
 The Supreme Court will review certain equal protection challenges under more stringent standards strict and intermediate scrutiny. The former test whether the challenged classification is necessary to the accomplishment of a compelling state interest thus far has been reserved for discriminations based on race, national origin, alienage, and for classifications made on account of the exercise of a constitutional right by one of the two classes. The latter category whether the discrimination substantially furthers the achievement of an important governmental objective thus far has been applied only to classifications based on gender or illegitimacy. For a collection of cases, see generally G. Gunther, Constitutional Law ch. 10 (1975 and Supp.1979)
 
 
 [30]
 440 U.S. at 97, 99 S.Ct. at 943. See also Dieffenbach v. Attorney General of Vermont, 604 F.2d 187, 195 (2d Cir. 1979) ("In an economic matter such as this, we owe an extraordinary deference to state objectives almost the equivalent of a strong presumption of constitutionality . . . .")
 
 
 [31]
 Posner, The DeFunis Case and the Constitutionality of Preferential Treatment of Racial Minorities, 1974 Sup.Ct.Rev. 1, 28. For a marshalling of various criticisms of the rational relationship test, see generally Bennett, "Mere" Rationality in Constitutional Law: Judicial Review and Democratic Theory, 67 Calif.L.Rev. 1049 (1979); Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205 (1970); McCloskey, Economic Due Process and the Supreme Court: Exhumation and Reburial, 1962 Sup.Ct.Rev. 34; Note, Equal Protection: A Closer Look at Closer Scrutiny, Mich.L.Rev. 771 (1978): Note, Legislative Purpose, Rationality and Equal Protection, 82 Yale L.J. 123 (1972). But see Linde, Due Process of Lawmaking, 55 Neb.L.Rev. 197 (1976); Posner, supra
 
 
 [32]
 New Orleans v. Dukes, 427 U.S. 297, 305, 96 S.Ct. 2513, 2517-18, 49 L.Ed.2d 511 (1976) (per curiam)
 
 
 [33]
 416 U.S. at 9, 94 S.Ct. at 1541
 
 
 [34]
 In analyzing this legitimate purpose and rational relationship, we emphasize that we do so only for the purpose of adjudicating Mark-Garner's appeal of the dismissal of its § 1983 equal protection claim; we express no opinion whether the amendments can or would withstand all constitutional challenges. For example, suit might be brought alleging that the amendments were unlawfully intended to exclude the poor or racial minorities. See, e. g., Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). See generally Ellickson, Suburban Growth Controls: An Economic and Legal Analysis, 86 Yale L.J. 385 (1977); Developments in the Law Zoning, 91 Harv.L.Rev. 1427, 1624-1708 (1978). Inasmuch as Mark-Garner has not alleged that the zoning amendments are unconstitutionally exclusionary, however, we do not address that question here. See also note 42 infra
 
 
 [35]
 Vance v. Bradley, 440 U.S. at 97, 99 S.Ct. at 943
 
 
 [36]
 See, e. g., Lochner v. New York, 198 U.S. 45, 56-57, 25 S.Ct. 539, 543, 49 L.Ed. 937 (1905) (invalidating state law regulating working hours of bakery employees) ("This is not a question of substituting the judgment of the court for that of the legislature.")
 
 
 [37]
 See, e. g., id. at 58, 25 S.Ct. at 543 ("We think the limit of the police power has been reached and passed in this case. There is, in our judgment, no reasonable foundation for holding this to be necessary or appropriate as a health law . . . ."). For a collection of the cases tracing the rise and fall of the substantive due process doctrine, see W. Lockhart, Y. Kamisar & J. Choper, Constitutional Law 506-48 (1974). See generally McCloskey; supra note 31
 
 
 [38]
 See part 1 supra
 
 
 [39]
 Williamson v. Lee Optical Co., 348 U.S. 483, 487-88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). See Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 82-84, 98 S.Ct. 2620, 2635-2636, 57 L.Ed.2d 595 (1978); Whalen v. Roe, 429 U.S. 589, 596-98, 97 S.Ct. 869, 875-876, 51 L.Ed.2d 64 (1977); Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963)
 
 
 [40]
 See Dieffenbach v. Attorney Gen. of Vermont, 604 F.2d 187, 195 (2d Cir. 1979); Note, Equal Protection: A Closer Look at Closer Scrutiny, 76 Mich.L.Rev. 771, 831-37 (1978)
 
 
 [41]
 See part 1 supra
 
 
 [42]
 We emphasize again that today's holding is not a general affirmation of the constitutionality of the Bensalem zoning ordinance as amended. See note 34 supra. Mark-Garner's cross-claim alleged only a violation of the "generous" substantive due process standard. See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977). It did not claim that the law is unconstitutionally exclusionary and, indeed, probably could not do so inasmuch as it may not assert the rights of third-parties and did not join as cross-plaintiff a person who would allege, for example, that the law discriminated against him on the basis of race. See id. at 263-64, 97 S.Ct. at 562
 
 
 [43]
 Chicago, B. & Q. R. R. v. Chicago, 166 U.S. 226, 235-41 (1897)
 
 
 [44]
 If a taking is found to have occurred, courts generally will give the government the option either of abandoning the intrusive activity (if it is possible to do so) or of paying compensation. See, e. g., Agins v. City of Tiburon, 24 Cal.3d 266, 598 P.2d 25, 157 Cal.Rptr. 372 (1979), cert. granted, --- U.S. ----, 100 S.Ct. 658, 62 L.Ed.2d 639 (1980); Fred F. French Inv. Co. v. City of New York, 39 N.Y.2d 587, 594-96, 385 N.Y.S.2d 5, 8-9, 350 N.E.2d 381, 384-86 (1976)
 
 
 [45]
 Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 123-24, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)
 
 
 [46]
 Id. at 125, 98 S.Ct. at 2660
 
 
 [47]
 Id
 
 
 [48]
 Id. at 126-27, 98 S.Ct. at 2660 (citing Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (upholding mandatory removal of diseased cedar trees without compensation for loss of land value); Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (upholding law prohibiting claimant from continuing otherwise lawful brickyard business on ground that legislature reasonably concluded that continuance was inconsistent with neighboring uses))
 
 
 [49]
 369 U.S. at 594-96, 82 S.Ct. at 990-991
 
 
 [50]
 Id. at 592-94, 82 S.Ct. at 988-989
 
 
 [51]
 438 U.S. at 138, 98 S.Ct. at 2666. The Court emphasized the importance of the fact that the law had not severely diminished the economic value of the Terminal:
 We emphasize that our holding today is on the present record, which in turn is based on Penn Central's present ability to use the Terminal for its intended purposes and in a gainful fashion. The city conceded at oral argument that if appellants can demonstrate at some point in the future that circumstances have so changed that the Terminal ceases to be "economically viable," appellants may obtain relief.
 Id. at n.36. Cf: Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (striking down application of statute forbidding coal mining that could cause subsidence of dwellings because the harm protected against was not public and law made coal mining commercially impracticable).
 
 
 [52]
 See parts 1 & 2 supra
 
 
 [53]
 438 U.S. at 133-35, 98 S.Ct. at 2664-65 (citing Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928); Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915); Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Goldblatt v. Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962))
 
 
 [54]
 Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922)
 
 
 [55]
 See, e. g., id. See also Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (government's complete destruction of a materialman's lien in certain chattels held to constitute a taking)
 
 
 [56]
 438 U.S. at 131-32, 98 S.Ct. at 2663-2664
 
 
 [57]
 Id. at 131, 98 S.Ct. at 2663 (citing Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (75% diminution); Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (87.5% diminution))
 
 
 [58]
 We follow the Supreme Court's caveat in Penn Central, see note 51 supra, and limit our decision to the facts as alleged in Mark-Garner's cross-claim
 
 
 [59]
 Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), does not alter our analysis. There, the Court assumed that the plaintiffs had alleged a colorable "taking" claim under § 1983 so that it could decide the question whether the Eleventh Amendment bars the federal courts from taking jurisdiction over an action brought against a bi-state commission. Because it was not raised in the petition for certiorari, the Court specifically reserved the question of the sufficiency of the complaint. Id. at 397 n.11, 99 S.Ct. at 1175. We have found nothing in Lake Country Estates which suggests that the Court has reconsidered the "taking" analysis set forth in Penn Central
 The Supreme Court has recently granted certiorari in a case involving a challenge to local land use regulation. In Agins v. City of Tiburon, 24 Cal.3d 266, 598 P.2d 25, 157 Cal.Rptr. 372 (1979), cert. granted --- U.S. ----, 100 S.Ct. 658, 62 L.Ed.2d 639 (1980), the California Supreme Court sustained the dismissal of an inverse condemnation action for damages against the city. The court held that the proper remedy for an unconstitutional taking is a declaratory judgment or mandamus forbidding the illegal action, not damages. An action for damages, reasoned the court, would unduly usurp the legislative prerogative inasmuch as available alternatives declaratory or mandamus relief would permit the city to choose whether to terminate its application of the ordinance or to pay compensation. See Fulham & Scharf, Inverse Condemnation: Its Availability in Challenging the Validity of a Zoning Ordinance, 26 Stan.L.Rev. 1439, 1450-51 (1974). The narrow question presented in Agins does not appear to be pertinent to the issues in this case. Of course, we can only speculate whether the Supreme Court in the course of adjudicating Tiburon, will render a broader statement about taking challenges to zoning laws.
 
 
 [60]
 General legislation of course can have a differential impact on certain groups of landowners. For example, an ordinance limiting the height of buildings will affect a landowner who is planning to build or is constructing a fifty story building differently than it will his neighbor who owns a renovated, three-story colonial townhouse. Similarly, Mark-Garner probably was more severely burdened by the zoning amendments than were other owners of land in the R-4 district who possess existing dwellings and who had no plans for new construction. That differential impact does not however, change the character of the legislative act; nor does it entitle Mark-Garner, in its quest to nullify the legislation, to the protections of procedural due process. See text infra
 In contrast to legislative action is administrative action the scope of which is limited by the due process clause. An example of an administrative act would be the denial of a variance, because such an act involves not only general policy considerations but also application of that policy to an individual landowner. See, e. g., Tandy v. City of Oakland, 208 Cal.App.2d 774, 42 Cal.Rptr. 283 (1965); text at pp. 694-696 infra.
 Cf: South Gwinnett Venture v. Pruitt, 491 F.2d 5 (5th Cir.) (en banc) (county planning commission's denial of rezoning application held quasi-legislative and therefore not subject to procedural due process review), cert. denied, 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974). For a discussion of the legislative-administrative distinction, see generally, Developments in the Law, supra note 34, at 1508-13.
 
 
 [61]
 See generally Ely, The Supreme Court 1977 Term: On Discovering Fundamental Values, 92 Harv.L.Rev. 5 (1978); Ely, Toward a Representation-Reinforcing Mode of Judicial Review, 37 Md.L.Rev. 451 (1978)
 
 
 [62]
 See generally R. Dahl, A Preface to Democratic Theory (1956)
 
 
 [63]
 See generally Ratner, The Function of the Due Process Clause, 116 U.Pa.L.Rev. 1048 (1968)
 
 
 [64]
 Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)
 
 
 [65]
 Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)
 
 
 [66]
 See J. Nowak, R. Rotunda & J. Young, Constitutional Law 488-503 (1978) and cases collected therein
 
 
 [67]
 See text at note 65 supra
 
 
 [68]
 53 Pa.Stat. § 10614 (Purdon 1972)
 
 
 [69]
 Id. §§ 10910, 11003 and 11004
 
 
 [70]
 Id. § 10909
 
 
 [71]
 Id. In this case, Mark-Garner appealed on the ground that the Zoning Officer had ignored decisions of the Court of Common Pleas interpreting 53 Pa.Stat. § 10508(4) (Purdon 1972) as prohibiting application of the amendments to the Bensalem Village development. See note 5 supra. Section 10909 also provides landowners the right to proceed directly in the Court of Common Pleas
 
 
 [72]
 Id. § 10903 (Purdon Supp.1979)
 
 
 [73]
 Id. §§ 10908 and 10910 (Purdon 1972 & Supp.1979)
 
 
 [74]
 Id. §§ 11005(c), 11006(3)(b), 11008 (Purdon 1972 & Supp.1979)
 
 
 [75]
 Id. § 11010
 
 
 [76]
 Id. § 11011 (Purdon Supp.1979). The standards for the judicial decision are also set forth in this section
 
 
 [77]
 See text at notes 64-66 supra
 
 
 [78]
 See note 4 and accompanying text supra
 
 
 [79]
 Collins v. Hardyman, 341 U.S. 651, 661, 71 S.Ct. 937, 941, 95 L.Ed. 1253 (1951)
 
 
 [80]
 Section 1985(3) provides in relevant part:
 If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.
 
 
 [81]
 Section 1986 provides:
 Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed; and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.
 
 
 [82]
 Brawer v. Horowitz, 535 F.2d 830, 841 (3d Cir. 1976); Hahn v. Sargent, 523 F.2d 461, 469-70 (1st Cir. 1975), cert. denied, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 54 (1976); Hamilton v. Chaffin, 506 F.2d 904, 914 (5th Cir. 1975)
 
 
 [83]
 403 U.S. at 101, 91 S.Ct. at 1797. The Court noted that in light of § 1983, see part B supra, "(t)o read any (state action) requirement into § 1985(3) would . . . deprive that section of all independent effect." Id. at 99, 91 S.Ct. at 1796
 
 
 [84]
 Id. at 101-102, 91 S.Ct. at 1797-1798. The Court specifically reserved the question whether a conspiracy motivated by an "invidiously discriminatory intent other than racial bias" would be actionable under § 1985(3). Id. at 102 n.9, 91 S.Ct. at 1798 n.9
 
 
 [85]
 Last term, in Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the Supreme Court held that a conspiracy to deprive a person of a right created by Title VII, 42 U.S.C. § 2000e (1976), cannot be the basis for a cause of action under § 1985(3). Compare Glasson v. Louisville, 518 F.2d 899 (6th Cir.) (§ 1985(3) protects against discrimination based on political beliefs), cert. denied, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975), with Bellamy v. Mason's Stores, Inc., 508 F.2d 504 (4th Cir. 1974) (§ 1985(3) does not provide redress for employee discharge because of Ku Klux Klan membership); and Milner v. National School of Health Technology, 409 F.Supp. 1389, 1395 (E.D.Pa.1976) (employment discrimination based on gender within purview of § 1985(3)) with Cohen v. Illinois Inst. of Technology, 524 F.2d 818, 829 (7th Cir.) (§ 1985(3) may not constitutionally be applied to redress sexual discrimination), cert. denied, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976). Cf: McLellan v. Mississippi Power & Light Co., 545 F.2d 919 (5th Cir. 1977) (en banc) (§ 1985(3) provides redress only for conspiracies to discriminate by violating state or federal law)
 We also have no occasion to decide whether persons acting in legislative capacities can "conspire" within the meaning of §§ 1985(3) and 1986. See Porter v. Bainbridge, 405 F.Supp. 83 (S.D.Ind.1975).
 
 
 [86]
 383 U.S. at 726, 86 S.Ct. at 1139
 
 
 [87]
 397 U.S. at 403, 90 S.Ct. at 1213. See Lentino v. Fringe Employee Plans, Inc., 611 F.2d 474, 478-480 (3d Cir. filed Dec. 18, 1979)
 
 
 [88]
 Inasmuch as we affirm the district court's decision to dismiss the entire cross-claim, there is no occasion to discuss the questions of Eleventh Amendment immunity of the state officials raised by the defendants