**AARDVARK CHILDCARE AND LEARNING CENTER, INC.,**
et al., Plaintiffs,

v.

**TOWNSHIP OF CONCORD,**
et al., Defendants.

No. Civ.A. 03–5249.

United States District Court,
E.D. Pennsylvania.

Nov. 21, 2005.

Kenneth J. Benton, Terry E. Silva, Silva & Associates, Philadelphia, PA, for Plaintiffs.

Hugh A. Donaghue, Donaghue and Bradley, Media, PA, Richard W. Yost, Yost & Tretta, Philadelphia, PA, for Defendants.

## MEMORANDUM

GILES, District Judge.

### Introduction

Aardvark Childcare and Learning Center, Inc. and its principals, Joanne Drinkard, Francis T. Greiser, and Marian K. Greiser, ("plaintiffs") filed this action on September 17, 2003 and a second amended complaint on December 13, 2004, against the Township of Concord ("Township"), together with the following Township officials and former officials, sued in their individual and official capacities: John W. Cornell, former Township Manager; Rob-

ert Willert,[1] Township Manager; Chadd Ingram, Township Engineer; Manos Kavadias, Code Enforcement Officer; and John Alexander, Zoning Officer. Plaintiffs also named Pennoni Associates, Inc. ("Pennoni"), an independent firm which serves as the Traffic Engineering Consultant for the Township, as well as Ronald C. Moore, individually, who is employed by Pennoni and acts as the Township's Traffic Engineer.

Plaintiffs allege that defendants violated their constitutionally protected property rights and seek equitable relief and damages pursuant to 42 U.S.C. §§ 1983 and 1985.[2] Now before the court is the defendants' Amended Motion for Summary Judgment, made pursuant to Rule 56 of the Federal Rules of Civil Procedure.[3] For the reasons that follow at some length, defendants' Amended Motion for Summary Judgment is granted.

A review of the material, undisputed facts demonstrates that no rational jury could conclude that the time that it took for plaintiffs to receive an occupancy permit from the Township for the premises in question was the result of racial or irrational reasons or any other irregularity. Rather, that evidence demonstrates that plaintiffs were continually at fault and their fault caused the delay. Plaintiffs agreed to develop, and then failed or refused to submit a land development plan timely to the Township's Board of Supervi-

sors, through its Planning Commission, as a prerequisite to the grant of an occupancy permit. Plaintiffs developed an erroneous opinion from a source or sources other than Township management that they did not have to comply with the conditional use permit requirement of a land development plan as had been specified by the Board of Supervisors. Plaintiffs make no claim against the members of the Board of Supervisors or the Planning Commission. The Board of Supervisors established, after a hearing, the compliance conditions about which plaintiffs complain in their amended complaint. Plaintiffs did not appeal or seek reconsideration of the conditional use requirements, except on one occasion and, as to that, waiver of the land development plan component, the Board of Supervisors granted the relief sought because of plaintiffs' claims of financial distress. An alternative condition was imposed, but plaintiffs did not comply with that condition until April 2004.

### Factual Background

Consistent with Fed.R.Civ.P. 56, the alleged facts viewed in the light most favorable to the non-moving party follow.

Plaintiffs are the owners and operators of daycare/child education centers in Delaware County.[4] On September 27, 2001, they entered into a contingent purchase agreement with Covenant Presbyterian Church of Concord, Inc., for the 4.75 acre, two lot, property located at 335 Cheyney

---

1. Defendant Willert is misnamed as "Willard" in plaintiffs' Second Amended Complaint and defendants' Motion for Summary Judgment. (Second Amend. Compl. at ¶ 25).

2. Although 42 U.S.C. § 1981 appears in string citations in plaintiffs' Second Amended Complaint, plaintiffs' counsel specifically stated in a letter to the court, dated December 15, 2004, that plaintiffs did not intend to pursue claims under that statutory provision.

3. At the court's request, defendants amended their summary judgment motion to add page citations to quotations from depositions, to include missing exhibits and exhibit pages, and to remove all attorney marginalia from submitted exhibits.

4. At the time of suit, plaintiffs operated two facilities, one nonprofit, "Aardvark Childcare and Learning Center, Inc." in Norwood, Pennsylvania, and one for-profit, "Aardvark Day Care, Inc." in Primos, Pennsylvania.

Road, Glen Mills, Pennsylvania, 19342 in Concord Township ("the property"). This property included both a church building and a private residence. The sale agreement was contingent upon plaintiffs' receipt of a conditional use permit from the Board of Supervisors of Concord Township, allowing them to open a nonprofit daycare/child education center in the R2–zoned, residential neighborhood. On November 13, 2001, Ms. Drinkard applied to the Township for a conditional use permit, pursuant to Article 5 § 210–26(B)(1) of the Concord Township Zoning Ordinance. Plaintiffs' application materials included: a completed conditional use application form, an application fee, an Aardvark Day Care and Learning Center brochure, and color photographs of students and staff. (Defts.' Ex. 4, Aardvark Conditional Use Application). The application indicated that the plaintiffs intended to use the property as a day care center for up to 150 children. (*Id.*). However, the application was not specific as to the number of children that would likely be served in the facility, the number of parking spaces that would be required for parents and staff, the drop off and pick up times of the children by parents, the impact on parking of an evening educational component of the program, or the effect of the plaintiffs' operations on the traffic pattern at a dangerous intersection at the mouth of the only entrance to and exit from the property at Cheyney Road. If necessary, plaintiffs planned to create and pave new parking spaces (*See* Pls.' Ex. 8, Tr. 1/08/02, Conditional Use Public Hr'g. at 62, 82–84).

On January 8, 2002, a public hearing on plaintiffs' conditional use permit application was held before the Township's Board of Supervisors pursuant to Article 27 § 210–237(B) of the Concord Township Zoning Ordinance. (*See id.*). Plaintiffs' attorney presented six exhibits and witnesses, including: Ms. Drinkard; John Sperduti, another daycare provider; and Pastor Daniel Kiehl. Ms. Drinkard testified about plaintiffs' plans for parking and child-drop off, fencing of a playground, connecting the buildings to the public sewer system, and prospective students and staff. (*Id.* at 18–20, 31–35, 38, and 40–41). She explained the staff/student ratios required by the Pennsylvania Department of Public Welfare and her experience with working parents' use of flexible daycare services. (*Id.* at 24–27). Ms. Drinkard answered questions about the facility's nonprofit status and stated, "[W]e're going to service the community." (*Id.* at 76–77).

During the hearing, it became clear that the primary concerns of the surrounding residents and the members of the Board of Supervisors were safety related: the security of the children; fencing responsive to the sloping topography of the land towards a hazardous public road; traffic circulation on the facility's grounds; and the traffic conditions on the public highway, particularly at the stop sign on Cheyney Road at the entrance of the property. (*Id.* at 48, 50–52, 58–77, 79–80, and 90–92; Defts.' Ex. 25, Planning Memo, 1/03/02).

The Board of Supervisors assured the community that a land development plan and other elements necessary to deal with concerns regarding traffic, safety, signage, and light spillage would be required of the applicant, upon issuance of the requested conditional use permit, consistent with the way in which all other grantees of conditional use had been treated. The submitted land development plan would be reviewed for approval by the Township Planning Commission with input from the Township Traffic Engineer. (Pls.' Ex. 8, Tr. 1/08/02, Conditional Use Public Hr'g. at 53–54).

The Chairman of the Board, Dominic Pileggi, in response to concerns expressed about traffic, stated:

I think one of the things that the board would be looking for is that this go through a land development plan process; that we have a review of this by our planning commission to examine issues like that, to examine parking, to examine lighting, traffic circulation, and things like that.

I don't know if the rest of the board agrees with that. But I think that's going to be one way of getting a lot of these issues that we think are not wrong with your operation, but there are some problems with the site, try to get them out front and try to get them addressed in a way that's satisfactory.

(*Id.* at 53–54). When plaintiffs' counsel asked for clarification as to how that process would work, Mr. Pileggi explained:

What we've done in the past on conditional use is we render a decision regarding the conditional use limiting what conditions we want on this. Then we will turn you over to the planning commission for a full planning commission review. They will review it based on the ordinances we have in place and conditions that the board has placed upon the developer. That's normally how it's done.

(*Id.* at 55).

In addition, eight township residents spoke and asked questions of Ms. Drinkard, primarily regarding traffic flow on Cheyney Road. One neighbor expressed concerns about lighting spill-over from the plaintiffs property onto his. (*Id.* at 48, 50–52, 58–77, 79–80, and 90–92). Again, Mr. Pileggi gave assurances that the residents' concerns regarding lighting, traffic, and parking would be addressed through the land development process: "To put the township more at ease . . . this would have

to go through a land development process." (*Id.* at 54, 71, and 76).

The Board of Supervisors called as witnesses Robert C. Moore, the Township Traffic Engineering Consultant, and Robert T. Caldwell of the Township Planning Commission to comment on plaintiffs' conditional use application and any concerns they had regarding the proposed use of the property.

Mr. Moore requested additional information about the traffic at plaintiffs' other facilities to get a better sense of likely traffic patterns, and explained to plaintiffs that the Pennsylvania Department of Transportation regulates traffic signs and signals on Cheyney Road. (*Id.* at 43–45 and 52).

A memorandum submitted by the Township Planning Commission raised concerns about the property's sewer system, the safety of children, the need for fencing, and vehicle ingress and egress from the property. (*Id.* at 81–82; *see* Defts.' Ex. 25, Planning Memo, 1/03/02). Speaking on behalf of the Planning Commission, Mr. Caldwell reiterated the need for a detailed land development plan that included the plaintiffs' plans regarding traffic flow and fencing of the property. (Pls.' Ex. 8, Tr. 1/08/02, Conditional Use Public Hr'g. at 82–84). As the hearing concluded, Mr. Caldwell told Ms. Drinkard, "[Land development] would expedite the process for you, because if it comes to us without those things, you'll see it again." (*Id.* at 84).

Chairman Pileggi concluded the hearing by stating that the Board would grant the use permit contingent upon land development plan approval and additional conditions. (*Id.*).

On February 12, 2002, the Board of Supervisors issued Resolution No. 19–2002

("the Resolution").[5] This Resolution granted plaintiffs' conditional use application, "to permit the operation of an educational center for pre-school and kindergarten children," subject to plaintiffs' compliance with twelve (12) conditions. (Defts.' Ex. 5, Resolution No. 19–2002). Specifically, the resolution stated:

As a Conditional use [sic], the following is required:

1. Maximum number of students/patrons is 130. Any additional enrollment over that number would require a public hearing and approval by the Board.

2. All trailers and temporary structures are to be removed from the property.

3. Both the house and existing Church building are to be serviced by both public water and sewer.

4. Applicant to receive all required approvals from the Pennsylvania Department of Welfare and any other agencies that have jurisdiction over licensing such a facility prior to a certificate of occupancy from the Township.

5. The existing church building is to receive Pennsylvania Department of Labor and Industry approval as well as approval from the Concord Township Building Inspector and Fire Marshal prior to occupancy.

6. The existing parsonage use will be restricted to a single-family dwelling. No office or school use will be permitted in the building.

7. No after hours or weekend programs will be permitted with the exception of staff training, staff development and parent conferences (refer to written transcript).

8. Applicant will submit a land development plan to the Township for the project for the Township's review as per ordinance requirements.

9. Applicant shall provide a traffic circulation plan for approval of the Township showing all ingress, egress, circulation, parking, and loading and unloading areas for approval by the Township.

10. All existing site lighting whether on the buildings or site is to be re-evaluated so as to eliminate any spill over lighting or lighting shining into existing neighbors properties.

11. Due to the residential character of the area, property will be restricted to having only one (1) sign on the road, limited to 32 square feet that will be externally illuminated. No internally illuminated sign will be permitted. Type of sign, location and intensity of lighting to be approved by the Township. No building or other signs with the exception of directional signs will be permitted at the site.

12. Children's fenced in area to be at the rear of the site as shown by applicant's exhibit A-# 3.

Now therefore, be it resolved that the above referenced conditional use application be hereby approved subject to compliance with the before stated 12 conditions. (*Id.*).

The Board of Supervisors was authorized by statute to require a land development plan as a condition of conditional use approval. Section 603(c)(2) of the Municipalities Planning Code, 53 Pa. Cons.Stat. § 10603(c)(2), and Sections 210–236 through 210–238 of the Concord Township Zoning Ordinance provide that the Board

---

5. The Resolution was drafted for the Board of Supervisors by John Cornell, the Township Manager at the time.

of Supervisors may attach reasonable conditions and safeguards that it deems necessary in approving a conditional use. From the Board's point of view, plaintiffs' proposed plan for the property included two principal uses, the daycare center and a residence, on a single lot, as well as improvements, including an easement to provide public water and sewer to both the residence and existing church building, paving of the parking lot, and fencing around the playground. The proposed improvements to the two contiguous lots and the resulting changes to the traffic and parking patterns on the property triggered both engineering considerations and the Township's Land Development Ordinance. The Land Development Ordinance is authorized by Sections 501 and 107 of the Municipalities Planning Code, 53 Pa. Cons. Stat. §§ 10501, 10107. (Defts.' Ex. 24, D'Ignazio Report, Letter from Michael P. D'Ignazio to Hugh A. Donahue, 2/14/05).

The Board's authority was recognized by the plaintiffs' attorney at the conditional use hearing, and the plaintiffs agreed to, and accepted in writing, the twelve conditions set out in the Resolution, including completion of a land development plan acceptable to the Board of Supervisors through the Planning Commission. (See Pls.' Ex. 8, Tr. 1/08/02, Conditional Use Public Hrg. 54–55). The requirements of the Board of Supervisors were not conditioned upon the plaintiffs' acceptance of them. Plaintiffs took no appeal from the imposition of the above recited conditions.

Ms. Drinkard signed the Resolution on or about February 14, 2002. (Pls.' Ex. 9, Final Resolution, 2/14/02). However, she claims that, prior to signing the document, she asked Mr. Cornell to define her obligation to submit a land development plan. She states:

> I questioned him on the land development and he explained to me very clearly that I didn't have to go through land development unless we were going to make changes to the building.... He indicated to me that land development was put there in case we decided to add on to the building but that—the explanation he gave me was that we needed to address the other things and that land development was just put in there in case.

(Pls.' Ex. 10, Drinkard Dep., 1/14/05, at 88–89). Ms. Drinkard's recollection is corroborated by Mr. Greiser, who was present. (Pls.' Ex. 11, Greiser Dep. 1/27/05, at 9–10, 84–85, 98, and 145–46). Plaintiffs presently submit two sheets of paper, supposedly from the Township, which they claim prove that no land development plan was required at the time of the resolution.[6] (Pls.' Ex. 14, Township Documents). On the other hand, Mr. Cornell denies any such discussions with plaintiffs Drinkard or Greiser regarding the conditional use application or land use development plan. (Pls.' Ex. 44, Cornell Dep., 3/08/05, at 42–45). However, as applicants to the Board of Supervisors, plaintiffs were aware, or should have known, that changes to the conditions set forth in the Resolution could

---

6. One of these includes a handwritten notation next to plaintiffs' counsel's name and number, that "No Land Dev. will be required." (Pls.' Ex. 14, Township Documents). The other is a form entitled "Building Permit Application Process," which has check-marks under the N/A column next to the following categories: Land Development/Subdivision Approval, Signed Plans, Development Agmt, Street Numbers Assigned, Individual Lot Grading Plans, Zoning Review/Zoning Use (Yes/No), Historic Commission input required, Private (Homeowner Assn. Approval), Sediment & Erosion (Chapter 148), L & I Approved Plans, Driveway/Road Occupancy, Approval of PennDOT Highway Occupancy Permit Application, and CWI to Confirm All in Order. (Id.).

only be made by the Board of Supervisors. No relief from the land development plan condition was sought by them from the Board.

Plaintiffs did not engage the services of a professional engineer or consultant to interface with the Planning Commission and the Traffic Engineer to attempt compliance with the specified conditions. They chose to satisfy all necessary conditions as lay persons without such technical assistance.

Notably, during the conditional use public hearing, Mr. Caldwell of the Township Planning Commission stated that he was sympathetic to the plaintiffs' objective of opening a daycare center and offered to assist the plaintiffs in meeting the conditional use requirements in a manner that would be satisfactory to the Planning Commission. He stated:

> [Land development] would expedite the process for you, because if it comes to us without those things, you'll see it again. I'm trying to help you with this thing. I'm assuming I'll be the project manager on this. We'll be talking. I have a 13–year–old daughter, too, so I feel your pain.

(Pls.' Ex. 8, Tr. 1/08/02, Conditional Use Public Hr'g. at 84–85). Plaintiffs did not accept Mr. Caldwell's offer of assistance.

On March 14, 2002, plaintiffs' plumber registered as a plumber with the Township and applied for, and received, on the same day a permit to replace the boiler and install baby toilets in the church building from Maureen Kelly, the Code Secretary for the Township.[7] (Defts.' Ex. 27, Kelly Dep., 3/4/05, at 9, 13 and 71). According to Ms. Kelly, she was not aware at the time that only the Commonwealth, and not the Township-by virtue of recent rule changes—could issue boiler permits. (*Id.* at 22–27). Also, she did not know that the plaintiffs had conditional use requirements, the satisfaction of which would be necessary for issuance of permits. (*Id.*).

On March 22, 2002, JoAnne Demnicki, the Financial Secretary of the Township, sent a letter to Mr. Greiser explaining that according to Township Resolution 17–1998 he was required to post an escrow deposit with the Township and that until such funds were deposited, he would be invoiced for each bill from the Township. (Defts.' Ex. 28, Letter from JoAnne Demnicki to Francis T. Greiser, 3/22/02). She sent a follow-up letter to Mr. Greiser on April 4, 2002, thanking him for his prompt remittance for the Pennoni bill, and sending him a copy of Resolution No. 17–1998, in which the conditional use for land development section was highlighted. (Defts.' Ex. 29, Letter from JoAnne Demnicki to Francis Greiser, 4/4/02). Resolution No. 17–1998 provides that "all land development applications" require a $2,500 escrow deposition and a Township fee of $500.00.[8]

---

**7.** The plaintiffs' plumber was the brother of a friend of Ms. Kelly.

**8.** Additional correspondence between the plaintiffs and Township officials regarding specific requirements necessary to satisfy the elements of the conditional use permit included a letter from defendant John Alexander, the Township Zoning Officer, to Mr. Greiser on May 16, 2002, which read in pertinent part:

> Please be advised Concord Township requires all businesses to have a Zoning Use Approval, (Business List). I have enclosed Zoning Use, Approval, Chapter 214 for your review and a Zoning Use application. Please submit a completed application along with your check in the amount of $50.00. Also required will be two complete sets of L & I approved plans to be submitted for a township tenant fit-up permit. I am also enclosing a sign permit application for you to complete and return as soon as possible.

(Defts.' Ex. 30, Letter from John Alexander to Mr. and Mrs. Francis Greiser, 5/16/02).

According to Ms. Drinkard, she called Ms. Demnicki and Mr. Cornell after these letters were received, and was told that she did not need to place money in escrow with the Township for land development purposes. (Pls.' Ex. 10, Drinkard Dep., 1/14/05, at 131 and 179). As noted previously, Mr. Cornell denies having any conversation with plaintiffs regarding the conditional use permit and land development plan. (Pls.' Ex. 44, Cornell Dep., 3/08/05, at 42–45). As applicants for conditional use, plaintiffs knew, or should have known, that only the Board of Supervisors had authority to change Resolutions 17–1998 and 19–2002. Plaintiffs sought no clarification or exemption from the Board of Supervisors as to the requirements noted in the letter from Ms. Demnicki.

In late June or early July 2002, in response to a letter from the Concord Township Sewer Authority, approving the plaintiffs' revised plan to hook up the property to the public water and sewer system, Ms. Drinkard went to the Township building to get a plumbing permit. (Pls.' Ex. 10, Drinkard Dep., 1/14/05, at 406–10 and Pls.' Ex. 1, Letter from Thomas Chew to Joanne Drinkard, 6/25/02). While in the office, Ms. Drinkard claims that she described to one of the Township secretaries the subsidized childcare Aardvark planned to offer. (Pls.' Ex. 10, Drinkard Dep., 1/14/05, at 406–7). She alleges that the secretary told her that there was not a need for such a daycare in such an affluent community. Ms. Drinkard then related her plans for taking care of children whose parents were enrolled at Cheyney University, a nearby, historically black college. According to Ms. Drinkard, Manos Kavadias, the Code Enforcement Officer, "came out of his office or was right there at the counter at the time." (*Id.* at 406). However, there is no evidence that Mr. Kavadias overheard the conversation, reacted to it, or said anything in response.

On the morning of July 17, 2002, Robert Caldwell, Project Manager for the Township Planning Commission, while driving by the plaintiffs' property, observed what he believed was unauthorized construction activity. No land development plan had been submitted and no construction activity had been authorized through the Planning Commission. He called the Township Manager and asked that there be a determination of whether his suspicions were well-founded. In response, Mr. Cornell directed Mr. Kavadias, Code Enforcement Officer, to make an inspection of the property. (Defts.' Ex. 31, Cornell Dep., 3/8/05 at 58–60; Defts.' Ex. 34, Aff. of John Cornell).

Mr. Kavadias went to the property that day. Mr. Greiser, Ms. Drinkard, and another family member were replacing ceiling tiles when Mr. Kavadias entered without knocking. (Pls.' Ex. 11, Greiser Dep., 1/27/05, at 17). Mr. Kavadias introduced himself as the Code Enforcement Officer and told Mr. Greiser that there had been a report that he was making improvements without the necessary permits. He saw that a new commercial boiler had been installed. (Defts.' Ex. 33, Aff. of Manos Kavadias). Mr. Greiser told Mr. Kavadias that their plumber had obtained all necessary permits. Mr. Kavadias accused Mr. Greiser of lying, because as the Code Enforcement Officer, he was responsible for all permits and did not recall a permit being issued. (Pls.' Ex. 11, Greiser Dep., 1/27/05, at 18). He then called his office from outside of the building, and spoke to Ms. Kelly, who told him that she had issued the permit for the boiler, unaware of any conditional use permit requirements. Kavadias had observed that plaintiffs had undertaken other repairs and construction without necessary permits, including plumbing, alarm work, and interior

fit-out. (Defts.' Ex 33, Aff. of Manos Kavadias, 3/21/05).

According to Mr. Greiser, Mr. Kavadias then told him angrily that neither the plumber, nor the plaintiffs, would receive another permit. (Pls.' Ex. 11, Greiser Dep., 1/27/05, at 20). Mr. Greiser claims that he tried to calm Mr. Kavadias and explained that plaintiffs were just trying to open a daycare center to care for children. According to Mr. Greiser, Mr. Kavadias accused him of bringing "rif-raf into our township." (*Id.*). Mr. Kavadias pointed in the direction of Cheyney University. Mr. Greiser asked what Mr. Kavadias was pointing towards. Mr. Kavadias did not answer, but as he was walking away, he reportedly said "fucking niggers." (*Id.*) Ms. Drinkard testified that she overheard this exchange from her office. (Pls.' Ex. 10, Drinkard Dep., 1/27/05 at 409).

Mr. Kavadias denies ever using racial slurs. He claims that his comment was, "[W]e do not need those kind of people here," presumably referring to persons who proceed with construction without permits, believing that a commercial boiler had been installed without a proper permit. (Defts.' Ex. 33, Aff. of Manos Kavadias, 3/21/05).

Later that day, Mr. Kavadias sent a certified letter to plaintiffs informing them that, pursuant to Township Building Code, they were required to obtain permits for certain interior work in the former church building. (Pls.' Ex. 13, Letter from Manos Kavadias to Francis and Marian Greiser, 7/17/02). He advised that if they did not seek such permits, accompanied by state license and inspection ("L & I") approvals, within five days, a stop work order could be issued and they could be liable for fines of up to $1000.00 for each day they continued to work on the building. (*Id.*). The ongoing work was not shut down. No fines were ever imposed. When plaintiffs

and their plumber did submit permit applications the following week, Mr. Kavadias issued the requested permits. (Defts.' Ex. 33, Aff. of Manos Kavadias, 3/21/05).

Mr. Kavadias was copied on a letter, dated July 30, 2002, sent to plaintiffs by Township Manager Cornell, advising that no new permits would issue to them until the conditions of Resolution 19–2002 were satisfied. (*Id.*). Prior to the receipt of this letter in early August, Mr. Kavadias had no knowledge of the Resolution. (*Id.*).

The July 30, 2002 letter reads as follows:

It is very important that you submit a preliminary land development application (# 8) and secure the agree [sic] to approvals as specified in conditions # 4, 5, 9, and 10. Any construction or tenant fit-up activity on the property should stop immediately to insured [sic] that the provisions of Resolution No. 19–2002 are complied with where appropriate.

(Defts. Ex. 34, Aff. of John W. Cornell, 3/21/05). A copy of the Resolution was attached.

Plaintiffs claim this was the first time that Mr. Cornell ever told them that they were required to comply with the land development provision of the Resolution. From late July until late October 2002, they were denied permit applications from the Township, and all completed applications were put "on hold." (*See* Pls.' Ex. 18, Application for Zoning Use Approval, 7/23/02; Pls.' Ex. 21, Application for Sign Permit, 7/23/02; and Defts.' Ex. 27, Kelly Dep., 3/4/05, at 42–50 and 66–69). Specifically, Ms. Drinkard claims that she went to the Township offices on at least two occasions after July 17, 2002 and was told she could not receive a permit application. (Pls.' Ex. 10, Drinkard Dep., 1/14/05 at 126–127). According to Ms. Kelly, Mr. Cornell told her that the hold was to be in place until plaintiffs complied with the

terms of the conditional use resolution. (Defts.' Ex. 27, Kelly Dep., 3/4/05, at 42–50 and 66–69).[9]

Plaintiffs claim that they were denied a sign permit by Zoning Officer John Alexander, even though they installed a sign that was the same dimensions of the prior church sign. Ms. Drinkard apparently sent a letter to Mr. Alexander stating that she did not believe plaintiffs were required to obtain a permit, because theirs was as an educational use, and thus, they should be exempted from the permit requirements.[10] Plaintiffs claim that Mr. Alexander threatened them with sanctions and told them to remove the sign. (Pls.' Ex. 10, Drinkard Dep., 1/27/05 at 358). No sanction was ever imposed. Mr. Alexander does not deny that he refused to give plaintiffs a sign permit until "all the agencies having jurisdiction on occupancy [were] satisfied." (Pls.' Ex. 38, Alexander Dep., 2/24/05, at 127 and Pls.' Ex. 45, Letter from John Alexander to Francis and Marian Greiser and Joanne Drinkard, 10/21/02).

Over the summer of 2002, without aid of an engineer familiar with the Township's requirements for parking and traffic circulation, plaintiffs represented their own interests on these compliance issues. They had conversations and correspondence with Township Traffic Engineer Moore of

Pennoni and the Township Engineer, Chadd Ingram. (See, e.g., Defts.' Ex. 17, Letter from Joanne Drinkard to Ronald C. Moore, 10/21/02).

On October 22, 2002, Ms. Drinkard wrote to the Board of Supervisors to give an update on plaintiffs' attempts to comply with Resolution No. 19–2002. (Pls.' Ex. 29, Letter from Joanne Drinkard to Concord Township Planning Commission, 10/22/02). She informed them that the trailers had been removed (# 2), and that plaintiffs continued to comply with the restrictions on use of the former parsonage and the hours of operation (# 6 and 7). Ms. Drinkard stated that plaintiffs had secured approvals from the Pennsylvania Department of Land & Inspection and the Department of Public Welfare, but were waiting to hear from the Fire Marshall regarding inspection (# 4 and 5). She claimed that the lighting concerns had been addressed (# 10) and that the posted sign was within Township requirements (# 11). Ms. Drinkard promised to address the fencing requirement (# 12) after she received the plumbing permit necessary for the sewer hookup (# 3). She also noted that Mr. Moore had approved the parking and traffic flow plan (# 9).[11] In regards to land development (# 8), Ms. Drinkard wrote, in part, that:

a Grading plan in lieu of a land development plan as of November 1, 2002.

---

9. Plaintiffs allege that the decision by Mr. Cornell to put their permit applications on hold caused them to lose money and risk sanctions. Because they were unable to get a permit hook up to the Township sewer system, plaintiffs forfeited the deposit they had made to their original contractor and were forced to find another, more expensive contractor. According to Mr. Kavadias, "[i]n November/December of 2002 a permit was released for sewer hook-ups pursuant to the Township Manager's direction." (Defts.' Ex. 33, Aff. of Manos Kavadias). This directive came after plaintiffs were required to submit

10. Although such a letter was supposed to be listed as Plaintiffs' Exhibit 22 to their response to defendants' Motion for Summary Judgment, it was never produced by plaintiffs.

11. As of October 23, 2002, Mr. Moore notified Mr. Ingram that a traffic engineering review had been completed and that plaintiffs had satisfactorily addressed previous comments. (Pls.' Ex. 34, Mem. from Ron Moore to Chadd Ingram, 10/23/02). Plaintiffs were billed for these services.

I have addressed the areas noted on the January 3, 2002 Memorandum regarding sewer, fencing and vehicle traffic. I have also addressed all other areas of the resolution. We will be using the existing building and making no alteration to the parking area, we will use the existing macadam for all parking, as has been done in the past. In speaking with township personnel I anticipated a wavier [sic] from Land Development. If I need to request this waiver from Land Development please accept this as my formal request.

Attached please find a copy of the January 3, 2002 MEMORANDUM, as well as the Resolution 19–2002 for your convenience.

(*Id.*). Copies were sent to the Township Manager, the Township Engineer, and the Planning Commission's Project Manager, Robert Caldwell.

In response to Ms. Drinkard's letter, which was treated by the Board of Supervisors as a request for a waiver of the land development plan, a meeting was held in late October between Board Supervisors Pileggi and Cappelli, and plaintiffs and their counsel and Township management representatives Mr. Cornell, Mr. Ingram, and the Township Solicitor, John W. Wellman. (Defts.' Ex. 13, Ingram Dep., 1/25/05 at 60–61). Plaintiffs claimed that they were "flat broke" and could not afford to proceed with a land development plan. (*Id.* and Pls.' Ex. 10, Drinkard Dep. 1/14/05, at 162, 204, 253–54, and 258). The Board of Supervisors had not previously waived a land development plan requirement for a conditional use applicant.[12] It agreed to such a waiver for plaintiffs upon their compliance with alternate conditions that would meet basic objectives of a land development plan that was to be spelled out in a memorandum prepared by Mr. Ingram.

According to the November 1, 2002 memorandum from Mr. Ingram, which was distributed to, and acted upon favorably by the Board of Supervisors, the land development requirement was waived upon condition that plaintiffs provide, among other things, a full-sized engineered drawing as a Sediment and Erosion Control Plan, also known as a Chapter 148 Grading Plan. (Defts.' Ex. 13, Ingram Dep., 1/25/05 at 60–61 and Pls.' Ex. 37, Mem. from Chadd Ingram to John Cornell, 11/1/02). The text of the Memorandum follows:

Per the request of the Applicant, the following items shall be submitted to insure a complete review of the above-referenced application:

1. PennDOT Highway Occupancy Permit

2. Plumbing Permit

3. Full size engineered drawing depicting the following:

- Proposed storm water management (to some degree) to alleviate downstream erosion

- Lighting, in accordance to Township Zoning Ordinance, to insure both adequate lighting exists and that trespass light and motorist glare does not exist

- Spot grading or sufficient topography for the proposed parking lot and storm water management facility (if applicable)

- Curb stops or existing utility poles that define the parking areas

- All signage, striping, and related traffic improvements in accordance to Ron Moore's 11/23/02 review letter

---

**12.** Plaintiffs have not presented any evidence that conditional use applicants in an R–2 residential district were not required to submit a land development plan.

- The seal of the Registered Professional Engineer responsible for the plan preparation
- Property lines/boundary
- Location of proposed sewer lateral

Provided the above-mentioned items are provided, a complete plan review shall be conducted relative to item nos. 8, 9 and 10 contained within Resolution No. 19–2002. As I understand, this plan will be formally applied for as an Erosion and Sediment Control Plan in lieu of a Land Development Plan.

(Defts.' Ex. 7, Mem. from Chadd Ingram to John Cornell, 11/1/02).

The Township waived the land development plan requirement on the condition that plaintiffs perform in accordance with the Ingram memorandum.[13] This requirement was less rigorous and less costly than a full land development plan. However, plaintiffs thereafter failed and refused to prepare and submit a Chapter 48 Grading Plan. Plaintiffs claim that they never agreed to these amended conditions.[14]

Relative to the Chapter 148 Grading Plan, plaintiffs engaged Gladnick Wright Salameda Ltd. ("Gladnick"), an engineering firm. (Pls.' Ex. 23, Gladnick Expert Reports). After reviewing the Resolution, Mr. Ingram's November Memorandum, and other documents related to the property, Michael Gladnick sent plaintiffs a letter on December 3, 2002, that opined that "the submission of a Land Development application for this parcel would not provide any furtherance of the purpose of the Subdivision Land Development Ordinance (160–2) and the proposed sanitary sewer." (*Id.;* Letter from Michael Gladnick to Joanne Drinkard, 12/3/02, at 2). Further, in response to Mr. Ingram's November memorandum, he wrote that, "[i]t is unclear why an Erosion and Sediment Control Plan would be required." (*Id.*). He based this opinion on plaintiffs' representations that there was to be no change to impervious surfaces on the site, no change to the grading at the site, and that the Township Engineer had approved the parking arrangement. (*Id.*). Mr. Gladnick recommended that "the owner should revise the Parking Plan sketch and the Proposed Sanitary Sewer Lateral Plan to be resubmitted to the Municipality." (*Id.* at 3). When asked by plaintiffs to expand on his position, Mr. Gladnick reiterated that Storm Water Management was not necessary if there was to be no increase in the impervious coverage on the property. (Pls.' Ex. 23, Gladnick Expert Reports, Letter from Michael Gladnick to Joanne Drinkard, 2/19/03).

By correspondence dated January 9, 2003, Ms. Drinkard notified the Township of Mr. Gladnick's opinion that the new requirements put forth in Mr. Ingram's memorandum were not necessary and of plaintiffs' intention not to proceed with satisfying the requirements, including submission of a Chapter 148 Grading Plan. (Defts.' Ex. 20, Letter from Joanne Drin-

13. Following the October meeting, plaintiffs claim that they attempted to make progress in meeting the requirements of the Board's Resolution and Mr. Ingram's November Memorandum. On December 9, 2002, they received the sewer permit. (Pls.' Ex. 16, Kavadias Dep., Vol. II, 2/28/05 at 109). Thereafter, they hired a new contractor and the necessary sewer connection was completed on January 3, 2003. (Pls.' Ex. 10, Drinkard Dep., 1/27/05 at 470).

14. Plaintiffs claim that Mr. Moore and Pennoni required them to submit unnecessary plans and make unauthorized changes to their property, and then billed them for their review. Plaintiffs had agreed to pay for work by these defendants on their behalf. No complaint about the billing was made to them and no appeal was made to the Board of Supervisors or to the Court of Common Pleas.

kard to Concord Township Planning Commission, 1/0/03). In response, Mr. Ingram noted that while the Board of Supervisors had agreed to waive the requirement of a land development plan, the plaintiffs were still required to submit the Grading Plan. (Defts.' Ex. 21, E-mail response from Chadd Ingram to Joanne Drinkard, 1/10/03).

Plaintiffs were aware that submission of a Chapter 148 Grading Plan was an absolute condition for waiver of the land development plan. To the extent the plaintiffs believed relief from the requirement was necessary, they had an obligation to appeal to the Board of Supervisors or the Court of Common Pleas for clarification or correction. To the extent that they did not, they were deemed to have accepted the terms of the Ingram memorandum.

A final engineered plan, which addressed specific concerns raised by Mr. Ingram after a site visit, was not submitted by plaintiffs until April 1, 2004. It was deemed adequate by the Township on June 14, 2004. (Pls.' Ex. 23, Gladnick Expert Reports, Memorandum from Michael Gladnick to Joanne Drinkard, 3/3/05).

Plaintiffs also claim that the October 2002 meeting was the first time that they learned that they needed to get a Highway Occupancy Permit ("HOP") from the Pennsylvania Department of Transportation ("PennDOT") because Cheyney Road is a state highway. They claim that defendants were required to notify them of this requirement and that Mr. Moore and Pennoni were responsible for not telling them that the parking and traffic circulation plans they were submitting were subject to PennDOT's authority and jurisdiction. In support of their contention, plaintiffs cite Section 7210.502 of the Pennsylvania Uniform Construction Act, Act of Nov. 10, 1999, P.L. 491, *as amended*, 35 P.S. §§ 7210.101–7210.1103. It imposes a duty on municipalities to provide notice that an application for a highway occupancy permit is required. However, the provision did not become effective by law until April 2004, and it was not enacted by Concord Township until June 2004, two years after plaintiffs claim to have become aware of the requirement in 2002.[15]

Even if the notice provision had been in effect prior to 2004, it would not have specified the point in the application process that a municipality would have had to give notice. Typically, in the Township, parking and traffic egress and ingress issues, as they pertained to PennDOT HOPs, were discussed by the Planning Commission with the conditional use applicant once the applicant submitted a land development plan and the Commission had the opportunity to review it. The Township anticipated that issues related to the HOP application process would be resolved as part of the land development process. (Defts.' Ex.13, Ingram Dep., 1/26/05, at 172–173). Notice given during this time might satisfy the statute.

Following the October 2002 meeting, plaintiffs tried to obtain a HOP permit from PennDOT for Cheyney Road. On December 17, 2002, at the recommendation of Louis Cordivari, then PennDOT Permit Supervisor for Delaware County, Ms. Drinkard submitted a "minimal use" HOP application to PennDOT. (Pls.' Ex. 5, Cordivari Dep., 3/9/05, at 11). A minimum use application is appropriate when a maxi-

---

**15.** The Pennsylvania Uniform Construction Act was enacted in 1999, however, it did not go into effect until 90 days after the promulgation of the regulations comprising the Uniform Construction Code ("UCC") by the Department of Licenses and Inspection. The regulations went into effect in April 2004. 34 Pa.B. 319. In compliance with the UCC, Concord Township adopted Ordinance No. 277 of 2004 in June 2004.

mum of twenty-five vehicles is expected to visit the property daily. (*Id.*). Mr. Cordivari believed that as plaintiffs' operation grew, it would be appropriate for them to file for a larger volume permit. (*Id.* at 15). Ms. Drinkard notified the Township by letter that she had filed the necessary application and requested a letter from the Township to PennDOT acknowledging its submission. (Defts.' Ex. 20, Letter from Joanne Drinkard to the Concord Township Planning Commission, 1/9/03).

However, sometime after January 13, 2003, Mr. Cordivari was told by the PennDOT District Office that plaintiffs' application did not qualify for a minimum use permit but required a low volume permit.[16] (Pls.' Ex. 5, Cordivari Dep., 3/9/05, at 25). Following a site visit with representatives from PennDOT, plaintiffs submitted an application for a low volume permit on February 4, 2003. (*Id.* at 30 and 38). This application incorporated the changes mandated by PennDOT representatives, including new sight distances, different placement of the stop sign, and a redirection of the traffic circulation pattern, which required closing one driveway. (*Id.* at 32–35).

Ms. Drinkard attached informal drawings on letter sized paper rather than submitting fully engineered plans with the application. (*Id.* at 207–209). PennDOT reviewed the filing and in March 2003 sent comments back to Ms. Drinkard. She resubmitted new plans, including new notations but on an old engineered drawing prepared by G.D. Houtman & Son, Inc. for the church, without the firm's knowledge and authorization.[17] (*Id.* at 39 and 125, and Pls.' Ex. 39, Notices of HOP Filings to Township, Pls.' Ex. 10, Drinkard Dep., 1/14/05, 232–233). In April 2003, a meeting was held between Mr. Moore and representatives of PennDOT. Plaintiffs were billed by Pennoni for Mr. Moore's time. (Pls.' Ex. 35, Bill from Pennoni Asso. Inc., 5/29/03). Plaintiffs resubmitted plans in May 2003. (Pls.' Ex. 39, Notices of HOP Filings to Township, and Pls.' Ex. 5, Cordivari Dep., 3/9/05, at 103).

PennDOT, again, found plaintiffs' submissions deficient. (Pls.' Ex. 5, Cordivari Dep., 3/9/05, at 125–26). On July 23, 2003, plaintiffs submitted yet another application to PennDOT, this time with new, fully-engineered plans prepared by G.D. Houtman & Son, Inc. (Pls. Ex. 39, Notices of HOP Filings to Township). Steve Wasylyszyn of G.D. Houtman & Son, Inc., notified PennDOT and the Township that this was the engineering firm's first involvement in Aardvark's low volume permit application and requested that the Township issue a letter acknowledging the submission. (*See id.*, Letters from Steve Wasylyszyn to Chadd Ingram and Mary Ellen Culhane, 7/23/03). Upon review, PennDOT required additional changes to the application. (Pls.' Ex. 5, Cordivari Dep., 3/9/05, at 41). Plaintiffs submitted their final plan on August 7, 2003. It was approved by PennDOT as being sufficient for its review purposes on August 11, 2003. (*Id.* at 52). According to Mr. Cordivari, the average time for PennDOT's final ap-

---

**16.** A low volume driveway is a commercial driveway which is expected to be used by over 25 vehicles, and up to 1,500 trips per day. (Pls.' Ex. 5, Cordivari Dep., 3/9/05, at 81)

**17.** Defendants submit that the submission of these drawings was totally improper. Plaintiffs offer that they were merely trying to cut costs during the application process and were unaware that they did not have authority to mark up the church's own drawings and submit them to PennDOT. Plaintiffs had no authority to represent to PennDOT that the engineer had prepared the drawings submitted. G.D. Houtman & Son, Inc. eventually became involved in the application process on plaintiffs' behalf.

proval process is up to six months. (*Id.* at 188).

Plaintiffs' allege that defendants intentionally ignored their requests for an acknowledgment letter, while billing them for the April 2003 meeting with Penn-DOT, to prevent them from opening their childcare center.[18] They also claim that they were not told that they needed to submit a check to the Township for review of the plans until March 2004, when a check was submitted.[19] However, it is undisputed that the process typically employed by the Township is as follows. According to the Township Engineer, Ingram, the HOP plan is typically submitted after the first submission of the land development plan. (Defts.' Ex.13, Ingram Dep., 1/26/05, at 172–173). An appropriate Township professional then reviews the plan and forwards it with any comments to the applicant's professional. Subsequently, the applicant submits the HOP plan to the Township for Mr. Moore's review, and Mr. Moore then forwards an acknowledgment letter to Penn-DOT. (*Id.*).

PennDOT did not issue a HOP permit until April 1, 2004. (*Id.* at 38 and 67). According to Mr. Cordivari, PennDOT was waiting to issue the permit until it received written evidence that the Township had reviewed the submission. (*Id.* at 56 and 224). This process generally takes two to three weeks. (*Id.* at 42). Mr. Moore, on behalf of the Township, did eventually issue an acknowledgment letter on March

31, 2004, but it was not received by the time PennDOT issued the HOP permit. (Pls.' Ex. 3, Letter from Ronald Moore to Lou Cordivari, 3/31/04). Mr. Cordivari testified at deposition that the Aardvark file is the only file to his knowledge where it took so much time to get an acknowledgment letter from a township. (Pls.' Ex. 5, Cordivari Dep., 3/9/05, at 42). However, at the time PennDOT was awaiting acknowledgment from the Township, it did not know that the plaintiffs had not completed a land development plan, nor completed a Chapter 148 Grading Plan pursuant to the November 2002 Ingram memorandum, or that they had not paid Township fees for the services of the Township Engineer.

On September 17, 2003, plaintiffs initiated the instant action. Plaintiffs received a certificate of occupancy from the Township in June 2004. They have since enrolled students and commenced daycare operations. They were unable to install a playground until spring 2005 because the grant they had received for this purpose expired prior to the Township's issuance of the certificate of occupancy. (Pls.' Resp. to Defs.' Mot. for Summ. J., ¶ 46).

### Legal Standard for Summary Judgment

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

---

**18.** Plaintiffs claim that although defendants appeared to be willing to work with them following the October 2002 meeting, they continued to harbor animosity towards plaintiffs and their clients. As evidence, they submit an email from Mr. Ingram to Mr. Pileggi, Mr. Moore, Brenda Lamanna, and Mr. Cornell, dated December 17, 2002, in which Ms. Drinkard is twice referred to as "Drunkard." (Pls.' Ex. 46, E-mail from Chadd Ingram to Dom Pileggi, Ron Moore, Brenda Lamanna,

and Jack Cornell, 12/17/02). Mr. Ingram denies that the reference was intentional and claims he merely misspelled Ms. Drinkard's name. (Pls.' Ex. 26, Ingram Dep., 1/26/05, at 107–109).

**19.** Plaintiffs' cited exhibit belies this contention. (*See* Pls.' Ex. 30, Fax Cover Sheet from Concord Township to Joanne Drinkard, 9/9/03).

that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). In order to defeat a motion for summary judgment, disputes must be both 1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and 2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Transfer, Inc.,* 54 F.3d 1125, 1127 (3d Cir.1995).

### Discussion

■ Plaintiffs bring their claims pursuant to 42 U.S.C. § 1983. Section 1983 provides for civil liability for any person who, under color of state law, subjects another "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. This statutory provision does not create a cause of action, but provides a vehicle for federal court review of alleged violations of federal constitutional or statutory law.

■ In order to prevail on a § 1983 claim, plaintiffs must establish that: 1) a deprivation of a constitutionally or federally secured right occurred, and 2) the alleged deprivation was committed by a person acting under color of state law. *West*

*v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Hicks v. Feeney,* 770 F.2d 375, 377 (3d Cir.1985). As defendants Cornell, Willert, Ingram, Kavadias, and Alexander, were acting in their capacities as public employees during the events at issue, their actions were taken under color of state law. *Atkins,* 487 U.S. at 49–50, 108 S.Ct. 2250. Similarly, by virtue of the contract between Pennoni Associates, Inc. and the Township, both Pennoni and defendant Moore were acting under color of state law for purposes of § 1983 liability. *Id.* at 57, 108 S.Ct. 2250. Thus, the issue before the court is whether plaintiffs have produced sufficient evidence that they were deprived of their constitutional rights by the defendants to survive a motion for summary judgment.

### A. Claims Against Individual Defendants

#### 1. Substantive Due Process

Plaintiffs contend that Mr. Cornell, Mr. Willert, Mr. Ingram, Mr. Kavadias, Pennoni Associates, Inc. and Mr. Moore violated their substantive due process rights by denying and delaying permits and approvals in an attempt to prevent them from opening their daycare center. They contend that such actions were taken because these defendants did not want subsidized daycare in the Township and were opposed to their projected low-income and African–American clientele. Specifically, plaintiffs claim that the named defendants, while initially supportive of their conditional use application, became obstructive when they learned that plaintiffs intended to provide subsidized daycare services and to solicit business from students at Cheyney University and employees at the nearby prison.

■ In order "to prevail on a nonlegislative substantive due process claim, 'a plaintiff must establish as a threshold mat-

ter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies.'" *Nicholas v. Pennsylvania State University*, 227 F.3d 133, 139–40 (3d Cir.2000) (quoting *Woodwind Estates, Ltd. v. Gretkowski*, 205 F.3d 118, 123 (3d Cir.2000)). Real property ownership is undisputably a property interest protected by substantive due process. *Id.* at 141 (citation omitted). Therefore, plaintiffs have a protected property interest as the owners of the property on which Aardvark Childcare and Learning Center is located.

▮ The subsequent inquiry is whether defendants' actions interfered with plaintiffs' use and enjoyment of their land to a degree that implicates substantive due process. In *United Artists Theatre Circuit v. Warrington*, 316 F.3d 392 (3d Cir. 2003), the third circuit held that in order to challenge a municipal land-use decision as a violation of substantive due process plaintiffs must show that the defendants' conduct "shocks the conscience." *Id.* at 400 (relying on standard set in *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). The court noted that "[l]and use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper motives.'" *Id.* at 402. In fact, only "conduct intended to injure in some way unjustifiable by any government interest" is the kind of action most likely to be deemed "conscience shocking." *County of Sacramento*, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

▮ Plaintiffs argue that defendants' actions were conscience shocking with respect to their property rights. As examples of defendants' conscience shocking conduct plaintiffs cite defendant Kavadias' use of a racial slur and animosity towards plaintiffs; defendant Cornell's inconsistent statements regarding the necessity of completing a land development plan; and defendants Pennoni Associates, Inc. and Ingram's failure to advise the plaintiffs about the need to obtain a PennDOT HOP permit. As a result of defendants' alleged misconduct, plaintiffs claim that they suffered irreparable harm to the use of their property and suffered damages in the form of substantial costs in attempts to comply with the requirements of the conditional use Resolution that were authorized under law.

Despite plaintiffs' claims to the contrary, none of the defendants' actions can be deemed to be "conscience shocking." Moreover, plaintiffs have failed to make any factual allegations that indicate that defendants' actions were not justified by a governmental interest. The Township and its officials had a legitimate interest through statutory authority to determine the requirements necessary for approval of land use within the Township.

Racial comments attributed to the Township's Code Enforcement Officer, Kavadias, did not result in his denying permits upon plaintiffs' application. He issued permits until he was instructed not to do so by Mr. Cornell, the Township Manager. He denied permits until plaintiffs complied with Resolution 19–2002. No racially charged words are attributed to him or to any defendant, other than Mr. Kavadias. Further, there is no evidence that plaintiffs relayed to any other defendant or member of the Board of Supervisors or Planning Commission the words of Mr. Kavadias. Mr. Cornell unequivocally told plaintiffs in July 2002 that a land development plan was required. Plaintiffs, as applicants cannot be excused from knowing that only the Board of Supervisors could change its own Resolution.

Defendants acted in accordance with all state laws and local ordinances in enforcing the requirements of Resolution 19–2002. Plaintiffs agreed, both orally and in writing, to the imposition of the conditions therein, and did not comply with those conditions for grant of an occupancy permit prior to April 2004.

Thus, because there are no issues of material fact regarding whether defendants' conduct shocked the conscience, summary judgment must be granted in favor of the defendants on this claim.

### 2. Procedural Due Process

■ Plaintiffs claim that their Fifth Amendment right to procedural due process was violated because there was no way to appeal or challenge the decisions of the individual defendants regarding whether the plaintiffs had complied with the terms of the conditional use permit.[20]

■ Where a procedural due process claim is brought under Section 1983 "the existence of state remedies is relevant in a special sense." *Zinermon v. Burch,* 494 U.S. 113, 125–26, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). In *Zinermon,* the Supreme Court stated in pertinent part:

In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law. The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.

*Id.* A state provides adequate procedural due process when it affords a "full judicial mechanism" under which to challenge administrative decisions. *Rogin v. Bensalem Township,* 616 F.2d 680 (3d Cir.1980).

Plaintiffs did not object to any aspect of the conditional use requirements through appeal or request for Board of Supervisor reconsideration. They were required to know as applicants that any request for waiver or reconsideration would have to be to the Board of Supervisors, and if dissatisfied, to seek relief through appeal to the Court of Common Pleas.

Plaintiffs did not pursue any appeal route. Election not to appeal is tantamount to acceptance of an administrative body's requirements. Plaintiffs cannot be heard to complain about being required to do that which they agreed to do in writing and could be required to do, under law, if they wanted to pursue an occupancy permit.

Plaintiffs' claim of a violation of due process is without merit and summary judgment must be granted in favor of defendants on this claim.

### 3. Violation of Equal Protection

■ Plaintiffs allege that the individual defendants[21] violated their right to equal protection of the laws because they treated other "similarly situated" developers in the Township more favorably. In their response to defendant's Motion for Summary Judgment, plaintiffs allege, for purposes of equal protection, not that they

---

**20.** Plaintiffs fail to identify which defendants they bring this claim against, therefore, the court will assume they intend to bring this claim against all of the individual defendants.

**21.** Plaintiffs fail to identify which defendants they bring this claim against, therefore, the court will assume they intend to bring this claim against all of the individual defendants.

are a protected class but that they are a class of one. In *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), the Supreme Court held that single individuals or entities who are not alleged to be members of a protected class can bring an equal protection claim under a theory of "class of one." *Id.* at 564, 120 S.Ct. 1073 (per curiam). Class of one equal protection claims require that "the individual plaintiff alleges intentional and disparate treatment compared to others similarly situated and that there is no rational basis for the difference in treatment." *Id.*

Plaintiffs aver without evidence that other businesses and/or other daycare centers in Concord Township sought and obtained approval from the defendants for their operation(s) without the requirements being imposed on plaintiffs, namely, the requirement of producing a land development plan. Because plaintiffs did not intend to change the exterior structures or the "footprint" of the property, plaintiffs maintain that the Township's requirement of a land development plan was completely irrational and not required by Concord Township's city ordinances.

Plaintiffs erroneously assert that the following conditional use applicants were not required to undergo land development: (a) Garnet Valley School District; (b) Fuzzy Butts Doggie Day Care; and (c) Routhier's Bed and Breakfast. First, plaintiffs are conditional use applicants seeking to open a daycare in an R–2 residential district. None of the businesses cited above is similarly situated to plaintiffs.

Unlike plaintiffs, the Garnet Valley School District sought review by the Township for a use by right, not a conditional use. Importantly, the school district's application specifically contemplated land development and the District proceeded with that process.

Routhier's Bed and Breakfast was a conditional use application to operate a bed and breakfast. At the time of the application, the Routhier's home also had a nonconforming apartment use that predated R–1 residential zoning. The applicants did not agree to, nor did they sign the first resolution issued by the Board of Supervisors.[22] A subsequent resolution issued by the Board of Supervisors conditioned the ongoing operation of the bed and breakfast upon the cessation of the non-conforming apartment use.[23] While the applicants agreed to the conditions set forth in the second resolution, they eventually decided to discontinue the bed and breakfast use and retain only the non-conforming apartment use. Thus, the applicants were no longer bound by any of the conditions set forth in the resolution approving use as a bed and breakfast.

Lastly, Fuzzy Butts Doggie Day Care (daycare and grooming center for dogs) was a conditional use applicant. However, it was located in a C–1 local commercial district and was presented before the zoning board on a special exception pursuant to the Township's zoning code.[24] The applicant was seeking an exception to es-

---

**22.** Resolution 47–2001. The Routhier's did not want to comply with the condition to discontinue the non-conforming apartment use located in the dwelling prior to commencing operation of the bed and breakfast.

**23.** Resolution 55–2003 included the condition of a landscaping plan subject to the approval of the Board of Supervisors.

**24.** The property is zoned C–1 under which, pursuant to Zoning Ordinance Section 210–119.C(1), "any use of the same general character as those permitted by right (principal permitted uses) and not provided for in any other commercial district" is permitted by special exception, when authorized by the Zoning Hearing Board.

tablish a dog day care center within a structure that was being used as both a residence and a hair salon. No changes were contemplated to either the residence or the business.

Therefore, plaintiffs have not produced any particularized evidence to support their claims that any of these entities is similarly situated. Indeed, the evidence shows that the alleged comparatives are completely inapposite. Moreover, there is no evidence that any condition was imposed upon plaintiffs that was not imposed upon applicants similarly situated.

The Township cannot be said to have exhibited racial prejudice towards plaintiffs' intended use of the property, subsidized daycare services, because the intended use and the diverse clientele of the daycare center was made known to the Board of Supervisors at the time the conditional use application was submitted and their application was approved. Plaintiffs do not present a situation where they submitted a land development plan which was rejected for alleged inexplicable or discriminatory reasons.

Accordingly, plaintiffs' equal protection claim fails as a matter of law, and defendants' motion for summary judgment must be granted.

### 4. Regulatory Taking

Plaintiffs allege that defendants deliberately attempted to prevent them from satisfying the twelve conditions set forth in Concord Township Resolution 19–2002. As a result, plaintiffs claim they suffered substantial damages, including the costs of owning and maintaining the property without receiving the benefit of the anticipated income from opening and operating a daycare center. Plaintiffs contend that the defendants' actions constitute a regulatory taking in violation of the Fifth Amendment.

Courts invoke the takings clause only when zoning regulation interferes drastically with the property's possible uses. *Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1031 (3d Cir. 1987). In *Rogin v. Bensalem Township*, 616 F.2d 680, 690 (3d Cir.1980), the third circuit stated:

> [U]nless application of the law destroys or severely diminishes the value of the property, the Court will uphold the application. This is true even if the legislation prohibits 'a beneficial use to which individual parcels had previously been devoted and thus cause(s) substantial individualized harm.' (citation omitted).

Plaintiffs takings claim is without merit. Plaintiffs are seeking relief because they were denied the most desirable use of their land. However, plaintiffs have failed to present evidence that defendants' actions denied plaintiffs all economic use of their land, or that a limited use was permanent rather than temporary. Accordingly, defendants' motion for summary judgment must be granted.

### B. Qualified Immunity

Individual defendants, Willard, Cornell, Kavadias, Alexander, Ingram, and Moore claim entitlement to qualified immunity. Government officials are entitled to qualified immunity from suits brought against them under § 1983, based on their discretionary functions, as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is essentially " 'an entitlement not to stand trial or face the other burdens of litigation.' " *Bennett v. Murphy*, 274 F.3d 133, 135 (3d Cir.2002) (quoting *Mitchell v. Forsyth*, 472 U.S. 511,

526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The test for qualified immunity, outlined in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), is whether, taken in the light most favorable to the party alleging injury: 1) the facts show the government official's conduct violated a constitutional right, and 2) the constitutional right was clearly established, based on the specific context of the case. *Id.* at 201, 121 S.Ct. 2151. If a plaintiff fails to establish a constitutional violation, "the qualified immunity inquiry is at an end; the officer is entitled to immunity." *Bennett,* 274 F.3d at 133.

■■■ All the conduct of the individual defendants that affected plaintiffs' application was in accordance with each defendant's official capacity, with state and local zoning laws, and with the implementing regulations of the Township. Even Kavadias' application related conduct was protected. He approved all permits for which plaintiffs applied. He ceased permit issuance until plaintiffs complied fully with Resolution 19–2002 when he was told to stop by the Township Manager. The allegedly racially derogatory words attributed to him did not cause plaintiffs any delay in their compliance efforts.

Since the court has found that none of plaintiffs' claims is sufficient to establish a constitutional deprivation, the individual defendants are entitled to qualified immunity.

C.   Claims Against the Township

  1.   Constitutional Claims

■■■ Under *Monell v. Dept. of Social Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality may be found liable for violating an individual's civil rights under limited circumstances. In order to prevail on such a claim, a plaintiff must demonstrate: 1) the deprivation of a constitutional right; 2) that action was taken pursuant to a custom or policy of the local government unit; and 3) that such action was the cause of the deprivation. *Id.* Plaintiffs have not established that they were deprived of any of their constitutional rights. (*See supra.*)

■■■ Even if plaintiffs could be said to have made out a constitutional violation, they have identified no government policy or custom that was the cause of the violation. Land development plans have been required of other applicants for conditional use permits. There is no showing that those applicants belong to a racial minority group. Plaintiffs would have the court find that the individual defendants' refusal to issue permits or permit applications from July until October 2002 was official policy. However, defendants' actions were consistent with enforcing compliance with Resolution No. 19–2002.

Moreover, plaintiffs received beneficial treatment that had not been accorded to any other applicant similarly situated. When plaintiffs informed the Board of Supervisors, by letter, that they could not afford to comply with the requirement for a land development plan, the Board of Supervisors approved a waiver of the plan if plaintiffs complied with a less costly alternative regimen that would satisfy the objectives generally sought to be achieved through a land development plan. However, plaintiffs did not comply with this alternative plan, nor did they complete a full land development plan. Compliance with the alternative Chapter 148 Grading Plan did not take place until April 2004. An applicant who has been benefited by official action can hardly be heard to have been a victim of official policy.

Plaintiffs allege that the Township's failure to issue an acknowledgment letter in response to their PennDOT HOP application was an official government policy or

custom. There has been no showing that any other applicant received an acknowledgment letter for PennDOT purposes prior to submitting a land development plan satisfactory to the Planning Commission and Traffic Consultant. The custom was to issue such an acknowledgment letter when an applicant's land development plan had been received by the Township to assess whether it corresponded with the PennDOT HOP application.

Plaintiffs did not submit a completed HOP application to PennDOT until August 7, 2003. The usual process time for an application within PennDOT is up to six months. So, the HOP would not have been officially approved until March 2004. The Township has no obligation to report a review of the HOP to PennDOT until plaintiffs completed their obligations to the Township, including the payment of fees, of which they had full notice. (*See* Defts.' Ex. 15, Letter from Hugh A. Donaghue to Joanne Drinkard, 9/9/03). Plaintiffs did not pay the fees due for Township review of the approved HOP until the end of March 2004.

Since plaintiffs have failed to establish that they were denied any of their constitutional rights and have not identified a policy or custom of the Township that was responsible for the alleged deprivation, all of their § 1983 claims against Concord Township must be dismissed.

### 2. Conspiracy Claims

Finally, plaintiffs allege that all defendants conspired with one another to take all steps necessary to prevent plaintiffs from opening their daycare center. According to plaintiffs, the conspiracy was driven by racial motivation, allegedly stemming from aversion to the plaintiffs' projected clientele that would include African-Americans.

In order to prevail on a § 1985 conspiracy claim, a plaintiff must establish: 1) a conspiracy; 2) for the purpose of depriving, directly or indirectly, any person of the equal protection of the laws or equal privileges or immunities; 3) an act in furtherance of the conspiracy; and 4) that plaintiff was either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *United Bd. of Carpenters & Joiners, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 828–829, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (construing *Griffin v. Breckenridge,* 403 U.S. 88, 102–3, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Moreover, an "actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor." *See In re: Orthopedic Bone Screw Prods. Liab. Litig.,* 193 F.3d 781, 789 (3d Cir.1999) (citations omitted).

Plaintiffs simply allege that defendants acted with improper motive and for discriminatory reasons. Plaintiffs have not identified a separate underlying tort as a predicate for liability pursuant to a claim of civil conspiracy. Furthermore, a public entity and its officials are a single entity, and thus, incapable of conspiracy. *See e.g., Scott v. Township of Bristol,* 1990 WL 178556 (E.D.Pa.1990). Therefore, plaintiffs' conspiracy claim against the Township and individual defendants in their individual and official capacities is not legally cognizable.

### *Conclusion*

Based upon the undisputed evidence, viewed in a light most favorable to the plaintiffs, with all reasonable inferences therefrom going to the non-moving party, plaintiffs have failed to show there is any material issue of fact remaining for jury determination. Summary judgment is

granted in favor of all defendants on all counts.

An appropriate order follows.

### ORDER

AND NOW, this 18th day of November, 2005, upon consideration of the Defendants' Motion for Summary Judgment, it is hereby ORDERED that the motion is GRANTED. Accordingly, judgment is entered in favor of each defendant and against plaintiffs on all counts.